PENNFIELD OIL COMPANY, A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLEE, V. W.L. WINSTROM, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF R.W. WINSTROM, APPELLEE AND CROSS-APPELLANT, AND ANDREW L. WINSTROM, APPELLANT AND CROSS-APPELLEE.

720 N.W.2d 886

Filed August 18, 2006.   No. S-04-982.

David A. Domina and James F. Cann, of Domina Law, P.C., for appellant.

John R. Douglas, Brien W. Welch, and Daniel J. Epstein, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee W.L. Winstrom.

Rodney M. Confer and Jeanelle R. Lust, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellee Pennfield Oil Company.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## FACTUAL BACKGROUND

Pennfield Oil Company (Pennfield) is a closely held Nebraska corporation, formed in 1947 by R.W. Winstrom (R.W.). It has been a subchapter S corporation since 1987. At the time of the corporation's formation, R.W. held 50 shares of stock, as did

J.P. Stocker. Another 20 shares were later issued to V.J. Lich, and in 1948, the three shareholders entered into an agreement (the 1948 agreement) generally requiring redemption of the stock at book value upon the death of a shareholder or a shareholder's desire to sell stock. Stocker's shares were redeemed by Pennfield in 1949, and Pennfield's board of directors authorized the sale of Lich's stock to R.W. in 1951. Thus, in 1951, there were 70 outstanding shares of Pennfield stock, all held by R.W.

In 1960, R.W. gifted 20 shares of stock each to his two sons, W.D. Winstrom (Dean) and W.L. Winstrom (Bill). The three shareholders and their wives entered into a new agreement (the 1960 agreement), restricting ownership to the three shareholders and providing that "in the event of the demise" of any of the three shareholders, or if any of the three desired to dispose of stock, Pennfield "shall buy the stock at the book value of the stock, determined by a stockholders' meeting within thirty days of the date of demise or date of desiring to sell."

Dean's stock was redeemed by Pennfield in 1969. At this point, then, there were 50 outstanding shares of stock: 30 held by R.W., and 20 held by Bill.

In 1987, three stock certificates were issued to Bill, consisting of 5.27 shares gifted to Bill by R.W. This gave Bill a majority interest in the company—25.27 of the 50 outstanding shares. Later that year, R.W. died testate, and his will devised his Pennfield stock, or proceeds of its sale, to Bill. Bill also was the personal representative of R.W.'s estate (the Estate).

The Pennfield stock was a substantial portion of the Estate's assets, and the Estate elected to defer estate tax liability pursuant to I.R.C. §§ 6166 and 303 (1994), which permit deferral of estate tax liability for stock of qualifying closely held corporations. Evidence was presented that Pennfield's board of directors met on or about December 14, 1987, and resolved to invoke the 1960 agreement, but over an extended period of time because of the financial burden of redeeming the stock. Bill denied that any such meeting took place. As previously noted, the 1960 agreement required a meeting of "shareholders"; at this time, all the shares were owned by either Bill, in his personal capacity, or the Estate, of which Bill was the personal representative.

In 1988, Pennfield and all the shareholders (i.e., Bill and the Estate) entered into a new stock repurchase agreement (the 1988 agreement). Bill signed the agreement three times, on behalf of himself, the Estate, and Pennfield. The stated purpose of the 1988 agreement was "to confirm[,] restate, formalize and clarify" the existing 1948 and 1960 agreements. The 1988 agreement expressly applied to all outstanding stock as of the date of the agreement and stated that no transfer of shares would be made or recognized unless the transferee accepted the 1988 agreement and agreed to be bound by it. As with the previous agreements, the 1988 agreement provided for the redemption of stock at book value upon the death of a stockholder, "an offer by a Stockholder to sell stock to a person who is not a Stockholder of Pennfield, or the acceptance of an offer by a Stockholder of an offer to purchase such Stockholder's stock or any part thereof," or separation of a stockholder from employment with Pennfield.

The 1988 agreement further provided that

redemption of shares pursuant to this Agreement shall be closed at such time and place as shall be mutually agreed, not earlier than thirty (30) days, nor later than fifteen (15) months from the effective date, provided, that in the case of redemption of the stock of a deceased Stockholder, closing with respect to so much of the deceased Stockholder's shares as are required to be retained to enable Stockholder's estate to qualify for federal estate tax deferral pursuant to I.R.C. Sec. 6166 (or the parallel provision of any subsequent Code) shall be deferred, if requested by the Personal Representative, until the balance of such deferred federal estate tax is paid.

The 1988 agreement also provided:

Pennfield may waive its right to redeem and Stockholder or Personal Representative may waive the right to sell the stock to Pennfield as follows;

a) in the case of redemption by reason of death, if such stock will pass, pursuant to the will or other testamentary disposition of such Stockholder or the applicable laws of descent and distribution, or

      b) in the case of redemption by reason of proposed transfer, if such stock will be transferred,

to a person who is an employee of Pennfield and who had endorsed this Agreement with respect to the stock to be transferred.

Bill's son, Andrew Winstrom (Andrew), became president of Pennfield later in 1988. Andrew agreed to be bound by the 1988 agreement in 1990. At that time, all the outstanding stock was still owned by either Bill or the Estate. In 1990, Pennfield repurchased a total of 16.24 shares of stock from the Estate. This action was approved by Pennfield's shareholders (Bill and the Estate) and board of directors (Bill, Andrew, and another board member). At the same time, the board adopted a resolution to sell Andrew 15.89 shares. Andrew's obligation to pay for the stock was assigned to the Estate in partial satisfaction of the redemption price of the 16.24 shares Pennfield had repurchased, with Pennfield paying the difference directly to the Estate. When these transactions were completed, Bill held 25.27 shares, Andrew held 15.89 shares, and the Estate held 8.49 shares.

The Estate's tender of 8.09 shares of the stock redeemed by Pennfield was accomplished in a new stock redemption agreement (the 1990 agreement). The 1990 agreement was signed by Bill on behalf of the Estate, Andrew on behalf of Pennfield, and accepted by Bill in his individual capacity. The 1990 agreement specified that the 8.09 shares of stock were tendered pursuant to the 1948, 1960, and 1988 agreements and that all the parties "confirm[ed] and ratif[ied]" the 1960 agreement "as restated" in the 1988 agreement. The 1990 agreement also stated:

It is further agreed the rights and obligations of the [1988] Repurchase Agreement are continuing and either Estate or [Pennfield] shall have the right to enforce same at any time. Estate and [Pennfield] each stipulate and agree that any statute of limitations or rule of law of Nebraska or any other state which limits the time for filing any action pursuant to the agreement, whether in law or equity, is extended and tolled from the date hereof until either party hereto shall notify the other that such statute shall again commence to run.

In 1992, Andrew was gifted an additional 8.43 shares from Bill, bringing Andrew's interest in Pennfield to 24.32 shares. Bill still held 16.84 shares, and the Estate held 8.49 shares, for a total of 25.33 shares under Bill's control and *not* in Andrew's possession. Thus, Andrew was effectively a minority shareholder and would remain so if the Estate's stock was transferred to Bill, but Andrew would become the majority shareholder if the Estate's stock was redeemed by Pennfield.

In 1997, Bill sought to transfer the final 8.49 shares of stock in the Estate to himself, pursuant to R.W.'s will. Andrew, as president of Pennfield, refused to sign the stock certificate, and the attempt to transfer the stock was tabled. In 2000, the Estate made its final tax payment and Bill sought to close the Estate, and again to transfer the final 8.49 shares from the Estate to himself. Andrew again refused to sign the stock certificate. Andrew also refused to call a director's meeting to transfer the stock. On December 28, 2000, Bill, as Pennfield secretary, directed Pennfield's corporate counsel to note, on the corporation's stock register, that the 8.49 shares held by the Estate had been transferred to Bill. On January 23, 2001, Bill notified Andrew that he was calling a special meeting to amend the company bylaws and conduct other business; on the same date, Andrew filed a notice of redemption by Pennfield of the 8.49 shares.

On February 7, 2001, Andrew directed the filing of a petition in the district court on behalf of Pennfield, against Bill in his individual capacity and as personal representative of the Estate, seeking declaratory and injunctive relief and an order requiring redemption of the shares. Pennfield later filed an amended petition naming Andrew as an additional defendant. The district court temporarily enjoined all the parties from taking any action to vote or transfer the disputed shares. Andrew filed an answer and cross-claims, generally alleging breaches of contract and fiduciary duties by Bill. Bill filed an answer in which he alleged that the action on behalf of Pennfield was not authorized by Pennfield's board of directors. Both Andrew and Bill attempted to direct the retention of counsel for Pennfield; the dispute over which attorneys were authorized to represent Pennfield resulted in an interlocutory appeal that we dismissed because it was not

taken from a final, appealable order. See *Pennfield Oil Co. v. Winstrom*, 267 Neb. 288, 673 N.W.2d 558 (2004).

After the appeal was dismissed, the matter went to a bench trial in the district court. Shortly before trial, Bill and his wife, in their capacities as directors of Pennfield, filed a "Complaint in Intervention" seeking to have the action dismissed or, in the alternative, a declaration that "Pennfield does not have a right, obligation, or opportunity to redeem the 8.49 shares of stock currently held by [Bill], individually." The "Complaint in Intervention" was ultimately dismissed without prejudice by the court.

At the conclusion of the trial, the district court entered an order denying Pennfield's and Andrew's requests for relief. The district court found that at the time of R.W.'s death, the 1960 agreement was controlling, and the 1960 agreement required a meeting of shareholders within 30 days of a shareholder's death to establish the book value of the stock. The district court concluded that

> [b]ecause the meeting to determine the book value of the stock was not held within the contractually required time period . . . the proper method for exercising Pennfield's right of redemption—as indicated under the plain language of the [1960] agreement, was not followed and that Pennfield effectively waived its right of redemption. . . . Accordingly, [Bill] has not breached any fiduciary or contractual duties with respect to that agreement.

The district court did not discuss the effect of the 1988 or 1990 agreements with respect to its conclusion that Pennfield had waived the right of redemption under the 1960 agreement. However, the district court did conclude that even if Pennfield had a right of redemption under the 1960 agreement, "the intent of the parties in creating the agreement renders its enforcement in the present case improper." The court found that from "the plain language of the [1960 agreement,]" it was the intent of the parties to the 1960 agreement to keep the corporation's shares in Bill's ownership. The court found that Andrew was never intended to become a majority shareholder and that R.W. intended Bill to have his Pennfield stock. The court found that "fundamental fairness requires that [Bill] maintain ownership of the 8.49 shares." However, the court also found that "Andrew did

not act improperly" in instituting the present action and denied each and every other claim in Bill's and Andrew's pleadings. Andrew appeals the judgment of the district court.

## ASSIGNMENTS OF ERROR

Andrew assigns, concisely restated, that the district court erred in holding that (1) the technical failure to have a shareholder's meeting within 30 days of R.W.'s death waived Pennfield's contractual redemption rights and (2) the district court's equitable powers allowed it to ignore the clear language of the parties' contracts because the court had reached a contrary conclusion about the parties' intent concerning Pennfield's stock ownership.

On cross-appeal, Bill assigns that the district court erred (1) in failing to dismiss the petition filed on behalf of Pennfield because the evidence established that the action was initiated by Andrew and not authorized by the board of directors, (2) in failing to hold that Pennfield's and Andrew's claims were barred by the statute of limitations, and (3) in failing to hold that Pennfield's and Andrew's claims were barred by equitable estoppel.

## STANDARD OF REVIEW

■ While the issues presented in this case center on an alleged breach of contract, the relief sought was entirely equitable. To the extent that the meaning of the relevant contractual language is at issue, we are confronted with questions of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. See, *Kluver v. Deaver*, 271 Neb. 595, 714 N.W.2d 1 (2006); *Hans v. Lucas*, 270 Neb. 421, 703 N.W.2d 880 (2005).

■ However, given the nature of the relief requested, this action sounds in equity. See *Reichart v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002). In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard

and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

### CONTRACTUAL REDEMPTION RIGHTS

The first issue we address is that presented by Andrew's first assignment of error—whether the district court erred in determining that the attempted redemption of the Estate's stock was controlled by the 1960 agreement and that the terms of the 1960 agreement had not been satisfied. We note, initially, that the parties to this case do not dispute that stock transfer restrictions such as those at issue in this case are generally enforceable under Nebraska law. See, Neb. Rev. Stat. § 21-2046 (Reissue 1997); *Elson v. Schmidt*, 140 Neb. 646, 1 N.W.2d 314 (1941). As previously noted, the district court concluded in this case that the 1960 agreement was controlling with respect to stock redemption and that redemption had been waived because a meeting to determine the book value of the stock was not held within 30 days of R.W.'s death, as the 1960 agreement required. The district court erred in its analysis of this issue.

Even if Pennfield could be said to have waived redemption of the Estate's stock by not strictly complying with the terms of the 1960 agreement, the district court erred in not considering the effect and terms of the subsequent stock redemption agreements. Pennfield, Bill, Andrew, and the Estate were all bound by the 1988 agreement, which was expressly intended to "confirm[,] restate, formalize and clarify" the 1948 and 1960 agreements. The 1988 agreement specifically provides for redemption of stock and deference of redemption for tax purposes under circumstances that are effectively identical to the course of action that Pennfield actually pursued. The 1990 agreement expressly confirmed and ratified the 1960 agreement "as restated" in the 1988 agreement.

The terms of a written executory contract may be orally modified by the parties thereto at any time after its execution and before a breach has occurred, without any new consideration. *Whorley v. First Westside Bank*, 240 Neb. 975, 485 N.W.2d 578 (1992). Whatever the terms of the 1960 agreement may have been, the 1988 agreement clearly allowed the parties to delay

redemption for federal estate tax purposes. Even if Pennfield had waived redemption under the 1960 agreement, that right was extended under the 1988 agreement and further reinforced by the 1990 agreement. The court erred in concluding otherwise.

Bill argues on appeal that there can be no redemption under the 1988 agreement since there has been no "activating event" since the agreement was signed—because R.W. died in 1987, no shareholder has died since the 1988 agreement was reached. Brief for appellee Bill at 9. But it is plain from the 1988 agreement that it was intended to apply to the shares that were, at that time, held by R.W.'s estate. This is also evidenced by the fact that the 1990 agreement specifically invoked the 1948, 1960, and 1988 agreements as the basis for Pennfield's 1990 purchase of stock from the Estate.

Bill further argues that the parties had abandoned the 1960 agreement through their conduct. This argument is without merit for the reasons explained above. The 1960 agreement was confirmed and restated by the 1988 agreement, and Bill offers no argument that the 1988 agreement was ever abandoned. Bill also points out that the 1988 agreement permits Pennfield to waive the right to redeem the stock, if the stock will pass by will or testamentary disposition, to an employee of Pennfield who had endorsed the 1988 agreement. However, the record reflects that while a waiver of Pennfield's right to redeem was prepared, none has been adopted. Whether Pennfield can waive redemption under the 1988 agreement is not an issue in this appeal, given the record before us.

Andrew's second assignment of error takes issue with the district court's further conclusion that even if Pennfield had a right of redemption under the 1960 agreement, it would be "improper" to enforce the agreement in the present case, because of what the court determined to be the intent of the parties to that agreement. The court also erred in this regard.

First, the court correctly concluded that the 1960 agreement was unambiguous, and none of the parties challenge this finding on appeal. Thus, as the court noted, the intent of the agreement should be determined from the plain language of the document. But the court concluded, from the plain language, that the 1960 agreement evidenced an intent to keep the corporation's shares

within the Winstrom family "and, specifically, with [Bill]." There is little support in the 1960 agreement for the conclusion that Bill was to be the favored owner of Pennfield stock. Rather, the 1960 agreement took place when R.W. owned 30 shares of stock, and Bill and Dean each owned 20 shares. The 1960 agreement evinces an intent to keep ownership of the stock among R.W., Dean, and Bill, but does not indicate any preference for Bill. In fact, while the 1960 agreement addresses who were to be the stockholders, it in no way addresses who was to own the majority of stock.

Moreover, the court's analysis again fails to consider the provisions of the 1988 and 1990 agreements, which clearly anticipated that parties other than Bill would come into possession of Pennfield stock. In 1988, all the outstanding Pennfield stock was in the possession of Bill or the Estate. The 1988 agreement was signed by Bill as the then president of Pennfield, Bill in his capacity as a shareholder, and Bill as the personal representative of the Estate. In other words, Bill functionally entered into the 1988 agreement with himself. But the 1988 agreement expressly permitted, notwithstanding the redemption provision, inter vivos transfers from one stockholder to another stockholder who was signatory to the agreement—which Andrew became, in 1990, when he endorsed the 1988 agreement and Pennfield sold Andrew some of the stock it had redeemed from the Estate. The 1988 agreement makes little sense unless it was contemplated that Pennfield stock would be owned by someone other than Bill.

■ The court also supported its conclusion with the observation that Andrew was never intended to become the majority shareholder. But that observation, whether or not it is correct, is not based upon the plain language of the relevant, unambiguous agreements. Those agreements permit the redemption of stock from the Estate under the circumstances presented here, even if Bill did not expect them to have the effect of making him a minority shareholder; Andrew's desire to become majority shareholder is not an unlawful object. See *Baum v. Baum Holding Co.*, 158 Neb. 197, 62 N.W.2d 864 (1954). Although a party may in retrospect be dissatisfied with a bargained-for provision, an appellate court will not rewrite a contract to provide terms contrary to those which are expressed. *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003).

The district court also found, in essence, that Pennfield's right of redemption under the 1960 agreement was subordinate to what the court determined to be R.W.'s intent, evidenced by his will, that Bill have his stock. We first note that if the court's reasoning were correct, the parties would have acted improperly in 1990, when Pennfield purchased 16.24 shares of stock from the Estate and sold 15.89 shares of that stock to Andrew.

But more important, while R.W. devised his stock to Bill, R.W. was also certainly aware that the stock was subject to the 1960 agreement. The general rule is that while restrictions on the transfer of shares might not be applied to testamentary dispositions in the absence of express terms that refer to such transfers, express share transfer restriction agreements will be enforced. See, e.g., *Sorlie v. Ness*, 323 N.W.2d 841 (N.D. 1982); *Vogel v. Melish*, 31 Ill. 2d 620, 203 N.E.2d 411 (1964); *Taylor's Administrator v. Taylor*, 301 S.W.2d 579 (Ky. 1957); *Kerr v. Porvenir Corp.*, 119 N.M. 262, 889 P.2d 870 (N.M. App. 1994); *Avrett and Ledbetter Roofing and Heating Co. v. Phillips*, 85 N.C. App. 248, 354 S.E.2d 321 (1987); *In re Est. of Riggs*, 36 Colo. App. 302, 540 P.2d 361 (1975); *In re Estate of Martin*, 15 Ariz. App. 569, 490 P.2d 14 (1971). Cf., *Lauritzen v. Davis*, 214 Neb. 547, 335 N.W.2d 520 (1983) (holding that right to purchase stock under stock restriction agreements descended to heirs of third-party beneficiaries of agreements); *F.H.T., Inc. v. Feuerhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982) (concluding, without discussion of issue, that buyout stock transfer provision expressly referring to probate transfers was enforceable). See, also, *F.B.I. Farms, Inc. v. Moore*, 798 N.E.2d 440 (Ind. 2003); *Boston Safe Dep. & Tr. Co. v. North Attleborough Chapt. American Red Cross*, 330 Mass. 114, 111 N.E.2d 447 (1953); *Dixie Pipe Sales, Inc. v. Perry*, 834 S.W.2d 491 (Tex. App. 1992) (holding general restrictions on stock transfer extend to testamentary disposition). See, generally, 12 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 5460 (perm. ed., rev. vol. 2004 & Cum. Supp. 2005).

The 1960 agreement quite specifically provides for redemption of stock in the event of the death of a shareholder, and the 1988 agreement provides even more expressly for redemption of stock that is subject to testamentary disposition. They are

enforceable here against Bill and the Estate, especially given that R.W. and Bill signed the 1960 agreement, and Bill and the Estate signed the 1988 agreement. R.W.'s will evinces an intent to leave his stock to Bill, but both R.W. and Bill also signed an agreement limiting R.W.'s power to devise his stock, and Bill (as both an individual and personal representative of the Estate) signed subsequent agreements disposing of the stock that R.W. meant Bill to have, and reaffirming the restrictions placed upon transfer of the remaining shares.

■ Finally, Bill argues that he already completed transfer of the disputed shares, since, acting as secretary of Pennfield, he directed that the transfer be recorded on Pennfield's stock ledger. But the fact that Bill was in a position to note a transfer of stock in the corporate records cannot defeat an otherwise effective right to redeem the stock under a valid stock repurchase agreement. A transfer in violation of restrictions on the transfer of corporate stock is voidable in equity. See, e.g., *Groves v. Prickett*, 420 F.2d 1119 (9th Cir. 1970) (applying California law), *F.B.I. Farms, Inc., supra.* See, generally, 12 Fletcher et al., *supra*, § 5453. In other words, Bill's technical completion of the stock transfer does not provide a defense to a claim that the transfer occurred in violation of the relevant stock transfer restriction agreements.

Andrew's assignments of error have merit. The plain language of the stock transfer restriction agreements does not support the construction placed upon them by the district court, and the district court erred in concluding that the terms of R.W.'s will could supersede the specific restrictions on stock transfer due to the death of a shareholder.

### CROSS-APPEAL

■ Since the trial court's reasoning was erroneous, we turn to the alternative bases for affirming the judgment set forth in Bill's cross-appeal. An appellee's argument that a lower court's decision should be upheld on grounds specifically rejected below constitutes a request for affirmative relief, and the appellee must cross-appeal in order for that argument to be considered. *New Tek Mfg. v. Beehner*, 270 Neb. 264, 702 N.W.2d 336 (2005); *Wasikowski v. Nebraska Quality Jobs Bd.*, 264 Neb. 403, 648 N.W.2d 756 (2002); *McDonald v. DeCamp Legal Servs.*,

260 Neb. 729, 619 N.W.2d 583 (2000). Here, the court concluded that "Andrew did not act improperly in instituting the present action" and denied the parties' remaining claims, but we consider the issues raised by the cross-appeal that present a basis for affirming the court's judgment on other grounds.

## INITIATION OF SUIT

Bill's first assignment of error on cross-appeal is that the court erred in not dismissing Pennfield's petition because it was not authorized by Pennfield's board of directors. Andrew admitted that he initiated Pennfield's petition in this action without direction or authority from Pennfield's board of directors. Andrew contends that this court addressed and rejected Bill's argument that the case should be dismissed with our disposition of the prior appeal in this case, *Pennfield Oil Co. v. Winstrom*, 267 Neb. 288, 673 N.W.2d 558 (2004).

Andrew's argument is without merit. In *Pennfield Oil Co.,* *supra*, a law firm, selected by the board of directors to represent Pennfield, attempted to appeal from the denial of its motion seeking leave to appear on behalf of Pennfield and disqualification of the counsel which had been representing Pennfield on Andrew's authority. However, we concluded that the district court had not entered a final, appealable order. See *id.* "[W]e [had] no jurisdiction over the appeal and [were] unable to reach its merits" and dismissed the appeal. *Id.* at 300, 673 N.W.2d at 567. The only issue we decided in *Pennfield Oil Co.* was whether the district court had entered a final, appealable order. Contrary to Andrew's argument, we did not decide, expressly or impliedly, whether the district court should have dismissed the action because Pennfield's board of directors had not authorized its filing.

Nonetheless, we conclude that the district court did not err in reaching the merits of this action. We initially note that although the board of directors of a corporation, under ordinary circumstances, controls an action brought by the corporation, that control is not unconstrained. See *System Meat Co. v. Stewart*, 175 Neb. 387, 122 N.W.2d 1 (1963). A court of equity can and should interfere in the event of usurpation, fraud, gross negligence, or transgression of statutory limitations. See *id.* In particular, a board of directors of a corporation has no right to dismiss an action through collusion with the defendant. *Id.* Here, the

defendant—Bill—was also in effective control of the board of directors. Andrew's cross-claim alleged that Bill was in breach of his fiduciary duties.

But more significantly, regardless of how the action was initiated, the district court had jurisdiction to proceed, because Andrew, as a party to the agreements, also had standing to pursue their enforcement. In *F.H.T., Inc. v. Feuerhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982), we permitted a corporation and its minority shareholder to maintain an action against the majority shareholder to compel enforcement of a redemption clause signed by the shareholders. We explained the policy underlying transfer restriction agreements, stating:

> In [close] corporations, stock restrictions are devices often employed to insure that the management and control of the business remains with the same group of investors or with people well known to them. Such restrictions may be embodied in the articles of the corporation, in the bylaws, or in shareholder agreements, and generally provide that upon the withdrawal or death of a stockholder, his shares will be sold or transferred only to the remaining stockholders or to the corporation, or at least will be offered to them before being sold to any outsider. Such agreements make it possible for shareholders to choose future associates and prevent unwanted outsiders from entering the business if their integrity or business acumen is in doubt.

*Id.* at 865, 320 N.W.2d at 776. We also explained that

> " '[t]here seems to be no reason in principle why they (the stockholders of a corporation) should not be permitted to retain the control of the corporation in which they have embarked their fortunes among themselves, or such of them as stand by the vessel, where no question of a *bona fide* purchaser without notice is involved. In this court, where the intent of the parties is the thing sought to be enforced, every effort should be made to hold men to agreements into which they have voluntarily entered, where the same are not obnoxious to any law or policy, and upon the strength of which others have changed their position or circumstances, or parted with a valuable consideration. . . .' "

*Id.* at 866, 320 N.W.2d at 776.

In *Lauritzen v. Davis*, 214 Neb. 547, 335 N.W.2d 520 (1983), we implemented that policy by permitting nonsignatories of a stock transfer restriction to maintain an action to enforce the restrictions, on the theory that they were third-party beneficiaries of the restrictions. "Beneficiaries of a contract may recover thereon, though not named as parties, when it appears by express stipulation or by reasonable intendment that rights and interests of such beneficiaries were contemplated and being provided for thereon." *Id.* at 557, 335 N.W.2d at 526.

■ The essence of these authorities is that "[t]he intended beneficiaries of a share transfer restriction are entitled to enforce the restriction." 12 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 5460.70 at 169 (perm. ed., rev. vol. 2004 & Cum. Supp. 2005). In other words, the shareholders are all bound by the restriction and thus have standing to enforce the agreement against one another.

In the present case, Andrew brought claims against Bill in his individual capacity, seeking the same relief as Pennfield's petition. Bill and his wife filed a petition in intervention which sought, in part, a declaration that Pennfield had no right or obligation to redeem stock from the estate. The issues presented by the various pleadings were essentially the same: whether Bill's transfer of stock to himself from the Estate violated the stock transfer restriction agreements or whether Pennfield (in the absence of a valid waiver) was required to redeem the stock pursuant to the agreements. Regardless of whether the action was initiated properly, Andrew's cross-claims, and Bill and his wife's petition in intervention, effectively raised the same issues, so the court had before it all the parties to a legal dispute that was ripe for disposition. The court did not err in refusing to dismiss the action because Pennfield's board of directors did not authorize the initiation of the action.

## STATUTE OF LIMITATIONS

Bill also argues that Pennfield's and Andrew's claims should have been dismissed as barred by the statute of limitations. Bill's argument is that Andrew was aware in 1992 that Bill did not intend to redeem any more stock from the Estate and that this was when Andrew's cause of action accrued. Bill argues that Andrew was, in 1992, aware of sufficient facts for a cause of

action to accrue pursuant to the "rule regarding discovery." Brief for appellee Bill on cross-appeal at 44. See, e.g., *Gordon v. Connell*, 249 Neb. 769, 545 N.W.2d 722 (1996).

This argument is without merit for two reasons. First, as noted above, the 1990 agreement specifically confirmed the 1988 agreement and tolled the statute of limitations "until either party hereto shall notify the other that such statute shall again commence to run." There is no evidence in the record that such a notification was made.

Furthermore, it is apparent that the discovery rule is not relevant to this case. "Discovery," in the context of statutes of limitations, refers to the fact that one knows of the existence of an injury and not that one has a legal right to seek redress. *Id.* But a cause of action accrues and the statute of limitations begins to run when the aggrieved party has the right to institute and maintain suit. *Cavanaugh v. City of Omaha*, 254 Neb. 897, 580 N.W.2d 541 (1998). A cause of action in contract accrues at the time of the breach or failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury occasioned to him or her. *Id.* In point of fact, the 1988 and 1990 agreements could not be breached until the estate tax was paid and Bill attempted to transfer the stock in the absence of a valid waiver of Pennfield's contractual right to redeem the stock. While Andrew may have been aware that in 1992, Bill did not intend to redeem any more stock, Andrew was also aware that pursuant to the 1988 agreement, Bill could postpone redemption until the balance of the deferred estate tax was paid. Simply stated, no breach of contract had yet occurred in 1992, so what Andrew might have known or suspected is beside the point.

While Bill references the "rule regarding discovery," the theory actually being advanced is that of anticipatory breach, since no actual breach of the agreement had yet occurred. The anticipatory breach of a contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evidencing an intention to refuse performance in the future. *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000). But anticipatory breach requires an unequivocal repudiation of the contract. See *id.* Here, the evidence does not suggest a repudiation of the agreements

sufficiently unequivocal to constitute an anticipatory breach, particularly because, had Pennfield validly waived redemption, Bill's intent to keep the stock could have been accomplished within the bounds of the agreements.

In short, the district court did not err in rejecting Bill's statute of limitations argument.

## EQUITABLE ESTOPPEL

Finally, Bill contends that Pennfield and Andrew are equitably estopped from seeking redemption of the stock, because Bill would not have given stock to Andrew if Bill had known that the stock held by the Estate would eventually be redeemed, instead of being transferred to Bill. Because Bill cites no authority in support of this argument, it is unclear on what theory he believes Andrew should be estopped.

The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice. *In re Estate of Bauer*, 270 Neb. 91, 700 N.W.2d 572 (2005). Recovery on a theory of promissory estoppel, on the other hand, is based upon the principle that injustice can be avoided only by enforcement of a promise. *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006). Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *Id.*

But neither theory is applicable here. In this case, while Bill asserts that Pennfield and Andrew did not timely assert the right

to redemption, he does not allege that Andrew or Pennfield made any promises not to redeem the stock, or otherwise behaved in a way that would be intended or expected to lead Bill to believe that Pennfield would not assert the right of redemption. Bill argues only that Andrew did not reveal an intent to seek redemption of the Estate's stock at the time that Bill gave stock to Andrew. Even if Bill would have acted differently at the time had Andrew informed him of such an intent, in the absence of an affirmative act on Andrew's part reasonably expected to induce action or forbearance on Bill's part, Bill has not proved that Andrew is estopped. Bill's final assignment of error on cross-appeal is without merit.

### RELIEF

We have concluded that the court's reasoning for dismissing Pennfield's and Andrew's claims was erroneous, but that the court did not err in rejecting the alternative grounds for dismissing the claims that have been raised by Bill's cross-appeal. The remaining issue, then, is the relief to which Pennfield and Andrew are entitled. Pennfield's petition, and Andrew's cross-claim, sought a variety of declaratory and equitable relief. Generally, they sought a declaration of the parties' rights under the stock transfer restriction agreements, a finding that Bill and the Estate were in breach of the agreements, and injunctive relief directing the Estate to surrender the stock for redemption.

Contracts for acquisition of shares of a closely held family corporation, which stock is not obtainable in the open market, are proper subjects for specific performance. *Brown v. Knox*, 219 Neb. 189, 361 N.W.2d 540 (1985). But specific performance is not generally demandable as a matter of absolute legal right; it is addressed to the legal discretion of the court and will not be granted where enforcement of the contract would be unjust. See *Langemeier v. Urwiler Oil & Fertilizer*, 265 Neb. 827, 660 N.W.2d 487 (2003). In decreeing specific performance, courts ordinarily attempt to place the parties in the same position in which they would have been if the contract had been performed at the agreed-upon time. See *III Lounge, Inc. v. Gaines*, 227 Neb. 585, 419 N.W.2d 143 (1988). The party seeking specific performance must show that it has substantially complied with the terms of the contract, including proof that it is ready,

able, and willing to perform its obligations under the contract. *Satellite Dev. Co. v. Bernt*, 229 Neb. 778, 429 N.W.2d 334 (1988).

Here, we are not persuaded that on the record before us, Pennfield and Andrew are equitably entitled to a decree ordering the Estate to surrender the stock for redemption. The 1960 agreement provided that if stock was to be redeemed, Pennfield would buy the stock "at the book value of the stock, determined by a stockholders' meeting within thirty days of the date of demise." Although the 1988 agreement changed the time at which redemption would occur, and explained in more detail what was meant by "book value," there is no indication in the 1988 agreement that it was intended to supplant the requirement, from the 1960 agreement, that the shareholders make the determination of book value at a shareholders' meeting prior to redemption.

The record before us indicates that such a meeting has not taken place. Moreover, the record suggests that Andrew was personally responsible for preventing the board of directors from meeting before Andrew directed Pennfield to demand redemption of the shares. Thus, the record indicates that the redemption was not authorized by the board of directors, nor was the board of directors permitted to consider whether redemption should be waived pursuant to the waiver provision of the 1988 agreement. As a practical matter, a meeting of the board of directors or stockholders could not have taken place, given the district court's temporary injunction preventing the Estate's shares from being voted. Generally, the purpose of a temporary injunction is to protect the subject matter of litigation and preserve the status quo of the parties until a determination of the case on the merits. See, *State ex rel. Beck v. Associates Discount Corp.*, 161 Neb. 410, 73 N.W.2d 673 (1955); *State v. Baker*, 62 Neb. 840, 88 N.W. 124 (1901). Here, while the district court's concern was understandable, the temporary injunction may have had the unintended effect of materially altering the respective positions of the parties.

Based on the reasoning set forth in previous sections of this opinion, we find that Pennfield and Andrew are entitled to declaratory relief, establishing that Bill and the Estate are subject to a valid demand for redemption of the stock pursuant to the stock transfer restriction agreements. But the record does not affirmatively show that Pennfield took all the steps necessary to

redeem the shares, and it appears that the district court's temporary injunction may have prevented Pennfield's shareholders and board of directors from exercising their duties with respect to the redemption agreements. Thus, we conclude on this record, it would be unjust to decree specific performance of the stock transfer redemption agreements.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court, and remand the cause with directions to grant Pennfield and Andrew declaratory relief that is consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.