IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

ROWSE HYDRAULIC RAKES CO. V. ROWSE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ROWSE HYDRAULIC RAKES CO., INC., ET AL., APPELLEES AND CROSS-APPELLANTS,

V.

STEVEN E. ROWSE ET AL., APPELLANTS AND CROSS-APPELLEES.

Filed February 7, 2023.    No. A-22-111.

Appeal from the District Court for Garfield County: MARK D. KOZISEK, Judge. Affirmed.

James V. Duncan and Julianna S. Jenkins, of Sennett, Duncan, Jenkins & Wickham P.C., L.L.O., and David S. Houghton and Justin D. Eichmann, of Houghton Bradford Whitted, P.C., L.L.O., for appellants.

Brian J. Koenig and Emily M. Coffey, of Koley Jessen P.C., L.L.O, for appellee Rowse Hydraulic Rakes Co.

Kristopher J. Covi, of Dvorak Law Group, for appellees Dannie D. Rowse, Linda J. Worden, Virginia L. Rowse, Jerry E. Rowse, and Pendala S. Dockweiler.

MOORE and RIEDMANN, Judges.

MOORE, Judge.

### INTRODUCTION

Steven E. Rowse, as successor trustee of the Betty J. Rowse Living Revocable Stock Trust (Betty's trust), and Terry E. Rowse appeal from the judgment of the district court for Garfield County entered against them and in favor of plaintiffs Rowse Hydraulic Rakes Co., Inc. (Rowse Rakes) et al. on the plaintiffs' claims for breach of contract and for specific performance. The court found in favor of the defendants on other claims, and the plaintiffs have cross-appealed. For the reasons set forth herein, we affirm.

- 1 -

STATEMENT OF FACTS

PARTIES

Rowse Rakes is a Nebraska corporation that manufactures tools such as hay rakes and sickle bar mowers and a line of dirt scrapers. Rowse Rakes was founded in 1959 by Freeman Rowse and Betty Rowse and has been owned and operated by various members of the Rowse family since that time. Freeman and Betty had four children, Dannie D. Rowse, Linda J. Worden, Ronnie A. Rowse, and Terry. Grandchildren of Freeman and Betty relevant to these proceedings are Rodney D. Rowse (Dannie's son); Randy L. Worden (Linda's son); Jerry E. Rowse, Pendala S. Dockweiler, and Darry M. Rowse (Ronnie's children); and Steven (Terry's son).

Freeman died on August 14, 2001, and Betty died on January 4, 2018. Steven is the personal representative of Betty's estate and is the successor trustee of Betty's trust. Ronnie died on September 13, 2015; his wife, Virginia L. Rowse, is the personal representative (PR) of Ronnie's estate, as well as the trustee of Ronnie's QTIP trust (Ronnie's Trust).

This law suit involves a dispute over 63.24 shares of stock in Rowse Rakes triggered by Betty's death, based on the parties' interpretations of documents outlined below. This suit was filed by Rowse Rakes, Dannie, Linda, Virginia (in her capacities as PR of Ronnie's estate and trustee of his trust), Jerry, and Pendala against Steven (in his capacity as successor trustee of Betty's trust), Terry, and Darry. Steven and Terry have appealed, and we refer to them collectively as "the Appellants." We have referred to the plaintiffs, who have cross-appealed, collectively as "the Appellees." Darry is also an appellee, but he did not appear at trial, and his brief on appeal declines to take a position with respect to the dispute.

APRIL 2001 AGREEMENTS

Certain relevant agreements were executed on April 16, 2001. One of those, entitled "SHAREHOLDERS AGREEMENT" (the 2001 shareholders' agreement), was between Rowse Rakes and the individuals who then owned shares of the company. The 2001 shareholders' agreement was executed by Ronnie, as president of Rowse Rakes, and by the shareholders Freeman, Betty, Ronnie, Dannie, and Linda. It defined "SHAREHOLDERS" as "all the owners of the presently issued and outstanding stock" and permitted transfers of stock "to another SHAREHOLDER or the issue of Freeman and Betty." Section 14.6 of the 2001 shareholders' agreement stated, "This Agreement replaces and supersedes all previous agreements between the SHAREHOLDERS and their predecessors and the CORPORATION concerning the transfer of stock of the CORPORATION including, but not limited to, those agreements dated March 18, 1980 and April 1, 1989." Our record also includes a copy of the 1989 "SHAREHOLDERS AGREEMENT," which does not contain language similar to that found in paragraph 14.6 of the 2001 agreement. The record does not include a copy of the 1980 agreement.

Two additional agreements entered into on April 16, 2001, were a "CONSULTING AGREEMENT" (the consulting agreement) between Rowse Rakes and Freeman and Betty and a "DISPOSITIVE ESTATE PLAN AGREEMENT" (the DEPA) between Rowse Rakes; Freeman and Betty as the owners of 63.24 shares of the company's stock; and Dannie, Ronnie, and Linda as heirs. The DEPA defined "HEIRS" as "the controlling shareholders of CORPORATION, being the owners of all shares in CORPORATION other than those shares held by OWNERS, and will

vote their stock therein to ratify said agreement for consulting with OWNERS by CORPORATION." The DEPA noted that as part of the consideration for the consulting agreement, Freeman and Betty "desire to pass said stock to HEIRS at their death." The DEPA provided further:

> In consideration of the tender of said consulting agreement, and the commitment of HEIRS to assure that CORPORATION will enter into said agreement, and in consideration of the payments thereunder agreed to be made to OWNERS; OWNERS agree that they will maintain in effect a dispositive estate plan, whether through their wills, or through revocable trusts, which will pass all of their respective ownership interests in said stock in CORPORATION to HEIRS outright no later than the death of the survivor of OWNERS.

The DEPA stated that it was intended to create an enforceable contract under "the Nebraska Probate Code Section 30-2351 entitled 'Contracts Concerning Succession'" and that it was to "extend to and be binding upon OWNERS, HEIRS, their personal representatives, heirs, legatees, successors and assigns, and CORPORATION, its successors and assigns." The DEPA was signed by Freeman and Betty as owners; Dannie, Ronnie, and Linda as heirs; and by Ronnie as president of Rowse Rakes. The consulting agreement provided for the payment of certain annual sums in quarterly installments to Freeman and Betty upon their retirement from full-time employment effective April 16, payable in quarterly installments, in return for consulting services. The consulting agreement also included noncompetition and nondisclosure provisions. The consulting agreement was signed by Ronnie as president of Rowse Rakes and by Freeman and Betty as consultants.

2008 SHAREHOLDERS' AGREEMENT

On June 20, 2008, Rowse Rakes and its shareholders entered into another "SHAREHOLDERS AGREEMENT" (the 2008 shareholders' agreement). The 2008 shareholders' agreement was signed by Randy, as president of Rowse Rakes, and by the company's then-existing shareholders: Ronnie, Dannie, Linda, Randy, Darry, and Rodney (all individually) and again by Ronnie, Dannie, and Linda (both as cotrustees of Betty's trust and as cotrustees of a trust executed by Freeman). The 2008 shareholders' agreement permitted transfer of stock "to another SHAREHOLDER or the issue of Freeman and Betty . . . provided that such SHAREHOLDER or issue is a full-time or part-time employee of CORPORATION." Paragraph 14.6 of the 2008 shareholders' agreement stated, "This Agreement replaces and supersedes all previous agreements between the SHAREHOLDERS and their predecessors and the CORPORATION concerning the transfer of stock of the CORPORATION including, but not limited to, those agreements dated March 18, 1980, April 1, 1989, and April 16, 2001." Also on June 20, 2008, the shareholders and directors of Rowse Rakes executed a corporate resolution document, entitled "ACTION BY UNANIMOUS CONSENT," approving the company's entry into the 2008 shareholders' agreement. This document included resolution language identical to that found in paragraph 14.6 of the 2008 shareholders' agreement.

AMENDMENTS TO BETTY'S TRUST

Beginning in 2001, following execution of the DEPA, Betty amended her trust on four separate occasions.

- 3 -

On July 20, 2001, Betty executed an "AMENDED AND RESTATED REVOCABLE TRUST AGREEMENT" (the 2001 trust amendment). Ronnie, Dannie, and Linda were the beneficiaries identified in the 2001 trust amendment, and it provided that, upon her death, Betty's shares in Rowse Rakes would be distributed to them "in equal shares." The 2001 trust amendment was signed by Betty as grantor and by Ronnie, Dannie, and Linda as cotrustees.

On January 27, 2005, Betty executed the "FIRST AMENDMENT" to the trust (the 2005 trust amendment). It altered the terms of the previous amendment to provide that, upon Betty's death, her shares of Rowse Rakes stock would be distributed to Ronnie, Dannie, and Linda or if any one of them did not survive her, that person's share was to be distributed to his or her "issue, determined as of the date of Grantor's death, by representation." The 2005 trust amendment was signed by Betty as settlor and by Ronnie, Dannie, and Linda as cotrustees.

On November 17, 2006, Betty executed the "SECOND AMENDMENT" to the trust (the 2006 trust amendment), which provided that, upon Betty's death, the shares would be divided equally to be distributed to Darry, Rodney, and Randy. Betty signed the 2006 trust amendment as settlor, and Ronnie, Dannie, and Linda each signed it as cotrustees.

Finally, on March 5, 2015, Betty executed the "<u>SECOND AMENDED AND RESTATED</u>" trust (the 2015 trust amendment). With this amendment, Betty named herself as trustee and designated Steven as successor trustee. With regard to distribution upon Betty's death, this amendment instructed the trustee to sell the stock, with any proceeds being distributed to Terry and Linda "one half each."

PARTIES' DISPUTE

After Betty's death in January 2018, competing claims to the 63.24 shares of stock were made under the DEPA and Betty's trust, leading to the present law suit. As summarized by the district court, the Appellees claim that as beneficiaries under the DEPA, Dannie, Linda, and Virginia in her representative capacity, are entitled to the stock or its proceeds. On the other hand, the Appellants, claim that the 2008 shareholders' agreement superseded and replaced the DEPA, leaving Betty free to dispose of her stock as she did in the 2015 trust amendment.

In their second amended complaint, the Appellees sought a declaratory judgment that the 2008 shareholders' agreement did not replace or supersede the DEPA. They also claimed that Betty had breached the DEPA when she executed the 2015 trust amendment to distribute the proceeds of her shares to Terry and Linda. In connection with their breach of contract claim, they sought specific performance to distribute the 63.24 shares of stock held by the trust pursuant to the terms of the DEPA. They also set forth a claim for recovery of the shares through replevin. Alternatively, the Appellees asked the court find that paragraph 14.6 of the 2008 shareholders' agreement was the result of a mutual mistake, and they sought reformation of that agreement to conform to the parties' intentions. They set forth an additional alternative claim for unjust enrichment, seeking damages against Betty's estate for amounts paid to her under the consulting agreement.

The Appellants answered and set forth various affirmative defenses in their answer. Darry answered separately.

A bench trial was held on October 26 and 27, 2021. The district court heard testimony from Rodney, Linda, Terry, and Steven, as well as from an attorney who represented Rowse Rakes up until 2014, and an attorney who conducted an estate plan review for Betty in the fall of 2016. The court received various exhibits, including the documents referenced above. We have briefly summarized below the testimony relevant to the issues on appeal.

According to Rodney, his understanding of paragraph 14.6 of the 2008 shareholders' agreement was that that agreement was "going to replace or supersede any previous agreement titled Shareholders Agreement." When he executed the 2008 shareholders' agreement, Rodney did not intend that it supersede the DEPA. He testified that "no other documents were discussed at the time we went over this [the 2008] Shareholders Agreement." He testified further that his interpretation of paragraph 14.6 as pertaining only to documents "titled Shareholders Agreement" was based on the information relayed at the time by Rowse Rakes' corporate attorney.

Rodney also testified about the corporate resolution entered in 2008. He stated that prior to approval of the resolution, he did not discuss the DEPA or the effect that the resolution would have on it. As with paragraph 14.6 of the 2008 shareholders' agreement, he understood that the similar language of the resolution meant that "it would replace or supersede any agreement entitled Shareholders Agreement." He did not intend for the language in paragraph 14.6 or the similar language in the corporate resolution "to effectuate a release of the [DEPA]."

Rodney confirmed that Rowse Rakes performed all its obligations under the consulting agreement up until Betty's death, providing her payments in excess of $310,000 for consulting. He testified that Rowse Rakes continued to do so because "it was . . . an agreement that we had with them per the [DEPA]."

Rodney was "[b]riefly" aware of the change made by the 2006 amendment to Betty's trust, stating any involvement on his part in discussions "amongst other shareholders or directors as to the effects of [that amendment] on Betty's trust would have been "on a small scale." He was not aware of any objections raised by the corporation or by Ronnie, Dannie, and Linda to the changes made by the 2006 trust amendment.

The corporate attorney, who was involved in preparing the 2001 shareholders' agreement and in presenting its terms to the shareholders for approval, confirmed that the purpose of paragraph 14.6 in that agreement was to "supersede and revoke all previous shareholder agreements," which he described as "[a]greements that look substantially like this [2001] Shareholder Agreement." He testified further that it was not his intention that paragraph 14.6 supersede the DEPA that was signed on the same day and stated that no one ever told him that it was their intention that the 2001 shareholders' agreement would supersede the DEPA.

The corporate attorney was not the individual at his firm who drafted the 2001 shareholders' agreement, but he had discussions both with that individual and with the shareholders. He testified that he did not know for certain whether there were any shareholders' agreement pre-dating the two specifically listed in paragraph 14.6 of the 2001 agreement and stated that the draftsman included the phrase "including, but not limited" in paragraph 14.6 due to his concern "that there might be one that we were not aware of." He agreed that paragraph 14.6 does

not include a specific reference to documents titled "Shareholders Agreement," and when asked why such wording was not included, he testified, "I do not recall."

The corporate attorney was also involved in presenting the terms of the 2008 shareholders' agreement to the shareholders for their approval, and testified that it was his intent that the 2008 shareholders' agreement supersede the 2001 shareholders' agreement. He recalled discussing paragraph 14.6 of the 2008 shareholders' agreement and its intention with the shareholders that approved that agreement. He stated that he did not intend that paragraph 14.6 of that agreement be used to supersede the DEPA, that the DEPA was not discussed with the shareholders in attendance, and that he did not tell them that the DEPA was going to be superseded. With respect to the language used in the 2008 corporate resolution, he testified that its purpose was "to ensure that all prior shareholder agreements were repealed and replaced," by which he meant "[a]greements that restrict the transfer of stock in the corporation, similar to the 2001 and 2008 Shareholder Agreements," and that he did not mean to include the DEPA within that definition. Again, he confirmed that there was no intent from the language used in the resolution to supersede the DEPA.

The corporate attorney's law firm drafted the 2005 and 2006 trust amendments, and he notarized Betty's signature on those documents. He believed the DEPA was still in effect at the time that those amendments were signed, and he did not believe that Dannie, Ronnie, and Linda were waiving their rights under the DEPA by signing those amendments. When asked if it ever occurred to him that the distributions outlined in the 2006 trust amendment "might be in conflict" with the DEPA, he responded, "I don't recall."

In her testimony, Linda stated that she did not disagree with any of the corporate attorney's testimony. She recalled "a time when [she] and Betty and Freeman and some other folks signed a document that said when [her] folks passed away, [she and Dannie and Ronnie] would get their shares." She did not "ever remember a time when [she] signed the document that cancelled that agreement." When Terry was asked whether he knew about the existence of the 2008 shareholders' agreement prior to Betty's death, he testified, "Not that I recall."

Linda recalled accompanying Betty on a series of meetings to meet with Betty's attorney to finalize changes set forth in the 2015 trust amendment. She testified that Terry also accompanied Betty on most of these visits, some of which were also attended by Ronnie and Steven. Steven's recollection about who attended these meetings was consistent with Linda's. Steven testified that the DEPA was never mentioned in these meetings and that he was not aware of its existence until after this lawsuit was filed. He testified that Ronnie encouraged Betty to make the changes she desired with respect to distribution of her stock that appeared in the 2015 trust amendment.

The attorney who conducted an estate plan review for Betty in the fall of 2016, was unaware of the existence of the DEPA; she did not receive a copy until after Betty's death. She testified that Linda, who attended the meetings with Betty along with Terry, never mentioned the DEPA to her.

JUDGMENT

On August 19, 2022, the district court entered judgment in favor of the Appellees on their claim for breach of contract and request for specific performance. It entered judgment in favor of the Appellants on the remaining claims. In analyzing the issues before it, the court first rejected the Appellees' arguments that the parties to the 2008 shareholders' agreement made a mutual

mistake and that the 2008 shareholders' agreement should be reformed. Next, the court found that paragraph 14.6 of the 2008 shareholders' agreement was ambiguous. Upon considering extrinsic evidence, the court concluded that "the parties did not intend to supersede and replace the DEPA by the execution of the 2001 and 2008 Shareholder Agreement[s];" but rather, only "intended to supersede and replace all prior 'Shareholder[s] Agreement[s].'" Based on this conclusion, the court determined that Betty breached the DEPA by failing to pass all of her ownership interest in the 63.24 shares of stock to Dannie, Ronnie, and Linda at her death, as required by the DEPA. The court also found that specific performance was the proper remedy for Betty's breach, and it ordered Steven to hold and transfer the 63.24 shares of stock according to the terms and conditions of the DEPA and the 2008 shareholders' agreement. We discuss the court's findings further in the analysis section below.

ASSIGNMENTS OF ERROR

Consolidated and restated, the Appellants assert that the district court erred in (1) finding that paragraph 14.6 of the 2008 shareholders' agreement was ambiguous, (2) interpreting paragraph 14.6 to find that the 2008 shareholders' agreement did not replace and supersede the DEPA, and thereby erred in (3) awarding specific performance of the DEPA.

On cross-appeal, restated, the Appellees assert that the district court erred in (1) finding that the signatories of the 2008 shareholders' agreement did not make a mutual mistake with regard to its meaning and effect and thus erred in (2) refusing to reform the 2008 shareholders' agreement. By the conditional wording of their assigned errors as originally stated, the Appellees recognize that a finding in their favor with respect to the issues raised by the Appellants on appeal, will make it unnecessary for us to address the issues raised on cross-appeal.

STANDARD OF REVIEW

The meaning of a contract and whether a contract is ambiguous are questions of law. *Community First Bank v. First Central Bank McCook*, 310 Neb. 839, 969 N.W.2d 661 (2022). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

ANALYSIS

AMBIGUITY

In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Community First Bank v. First Central Bank McCook, supra*. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract. *Id.* The fact that the parties have suggested opposing meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous. *Id.* Extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous. *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015).

As noted above, paragraph 14.6 of the 2008 shareholders' agreement stated, "This Agreement replaces and supersedes all previous agreements between the SHAREHOLDERS and their predecessors and the CORPORATION concerning the transfer of stock of the CORPORATION including, but not limited to, those agreements dated March 18, 1980, April 1, 1989, and April 16, 2001."

The Appellants assert that the district court erred in finding that this paragraph was ambiguous. They argue because the DEPA was an agreement between Rowse Rakes and its shareholders and because it concerned transfer of the company's stock, it was an agreement that was superseded and replaced pursuant to the above language. They argue further that any ambiguity determined by the court results from an impermissible review of extrinsic evidence.

The Appellees argue, however, that the words "previous agreements" refer only to the shareholders' agreements identified (those of March 18, 1980, April 1, 1989, and April 12, 2001) and that the words "including, but not limited to" refer to any possible shareholders' agreements executed on other dates. In other words, the 2008 agreement was only meant to supersede and replace the prior shareholders' agreements, and not the DEPA.

The district court discussed the parties' differing interpretations of paragraph 14.6 of the 2008 shareholders' agreement and found that the parties presented reasonable and conflicting interpretations of the language. The court therefore found that the paragraph in question was ambiguous and proceeded to analyze and interpret the extrinsic evidence set forth in the background section above.

In our independent review of this question of law, we determine that the 2008 shareholders' agreement did not supersede and replace the DEPA, however, we reach this conclusion without the necessity of determining that paragraph 14.6 is ambiguous. By its plain terms, the 2008 shareholders' agreement is between different parties than the DEPA. Specifically, paragraph 14.6 of the 2008 agreement states that it replaces all agreements between the shareholders and their predecessors and the corporation. However, the DEPA is an agreement between the corporation, Freeman and Betty individually as owners of 63.24 shares of the company's stock, and Freeman and Betty's heirs; Dannie, Ronnie, and Linda. The DEPA was signed by Freeman and Betty as owners; Dannie, Ronnie, and Linda as heirs (not as shareholders); and Ronnie as president of the corporation. Further, the DEPA does not broadly address the transfer of stock of the corporation as stated in paragraph 14.6 of the Shareholder's Agreement; rather, the DEPA concerns only the stock owned by Freeman and Betty, not by all shareholders. In addition, the DEPA required Freeman and Betty to maintain in effect a dispositive estate plan which would pass their respective ownership interest in the stock of the corporation to "HEIRS" (identified as Dannie, Ronnie, and Linda) in consideration for a separate consulting agreement. That separate consulting agreement provided for payments to Freeman and Betty upon their retirement, in return for consulting services.

For the foregoing reasons, we find that the plain language of the 2008 Shareholders' Agreement and the DEPA shows that paragraph 14.6 of the Shareholders' Agreement does not apply to the DEPA. We reach the same ultimate conclusion as the district court and find that the DEPA was not superseded or replaced by the 2008 Shareholders' Agreement. See *Keith v. Data Enters.*, 27 Neb. App. 23, 925 N.W.2d 723 (2019) (if trial court arrives at correct result even though it uses reason different from that expressed by appellate court, its judgment will still be upheld).

SPECIFIC PERFORMANCE

Contracts for acquisition of shares of a closely held family corporation, which stock is not obtainable in the open market, are proper subjects for specific performance. *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006). The district court found the evidence showed that the parties to the DEPA each fully performed the obligations required by the contract, except Betty did not pass all of her ownership interests in her 63.24 shares of stock in Rowse Rakes to Dannie, Ronnie, and Linda, thus, breaching the contract. Accordingly, the court ordered Steven to hold the 63.24 shares of common stock of Rowse Rakes and transfer them according to the terms of the DEPA and any further conditions on the transfer and ownership imposed by the 2008 shareholders' agreement. Although the Appellants assert that the court erred in awarding specific performance for Betty's breach of the DEPA, they do not challenge either the court's finding that Betty breached the DEPA or the details of the specific performance awarded by the court. They rely solely on their argument that the DEPA was superseded or replaced pursuant to paragraph 14.6 of the 2008 shareholders' agreement, which argument we have found to be without merit. Accordingly, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *Kozal v. Snyder*, 312 Neb. 208, 978 N.W.2d 174 (2022).

CROSS-APPEAL

On cross-appeal, the Appellees assert that the district court erred in finding that the signatories of the 2008 shareholders' agreement did not make a mutual mistake with regard to its meaning and effect and in refusing to reform the 2008 shareholders' agreement. Given our resolution of the issues raised by the Appellants, we need not address the issues raised on cross-appeal. See *id.*

CONCLUSION

The district court did not err in finding paragraph 14.6 of the 2008 shareholders' agreement was ambiguous and that the 2008 shareholders' agreement did not supersede or replace the DEPA. Our resolution of the issues on appeal makes it unnecessary to address the issues raised on cross-appeal, and we affirm the judgment entered by the court.

AFFIRMED.

WELCH, Judge, participating on briefs.