William Weber and Dixie Weber, husband and wife,
appellants, v. North Loup River Public Power
and Irrigation District, appellee.
___ N.W.2d ___

Filed August 29, 2014.    No. S-13-808.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

2. ____: ____. An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

3. **Contracts: Judgments: Appeal and Error.** The meaning of an unambiguous contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.

4. **Breach of Contract: Words and Phrases.** A breach of contract is the nonperformance of a duty, and performance of a duty subject to a condition cannot become due unless the condition occurs or its nonoccurrence is excused.

5. **Contracts: Words and Phrases.** A condition precedent includes a condition which must be fulfilled before a duty to perform an existing contract arises.

6. **Contracts: Intent: Words and Phrases.** Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract. Where the parties' intent is not clear, the language is generally interpreted as promissory rather than conditional.

7. ____: ____: ____. Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," "on condition that," or some similar phrase are evidence that performance of a contractual provision is a condition.

8. ____: ____: ____. No particular form of language is necessary to make an event a condition, although such words as "on condition that," "provided that," and "if" are often used for this purpose. An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language. Whether the parties have, by their agreement, made an event a condition is determined by the process of interpretation.

9. **Waiver: Words and Phrases.** Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.

10. **Waiver: Estoppel.** In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such purpose, or acts amounting to estoppel on his or her part.

11. **Contracts: Waiver: Proof: Intent.** A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by

express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive.

12. **Contracts: Waiver.** Conditions precedent in a contract may be waived.

13. **Breach of Contract: Intent: Words and Phrases.** An anticipatory breach of a contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evidencing an intention to refuse performance in the future.

14. **Breach of Contract.** The words or acts that form the basis of an anticipatory breach must amount to an unequivocal repudiation of the contract.

15. ____. Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to perform discharges the other party's remaining duties to perform.

16. ____. Generally, a party who has failed or refused to perform the terms and conditions imposed upon him by a contract, or has not been ready, willing, and able to perform the same, cannot recover for a breach thereof by the other party.

17. ____. A material breach will excuse the nonbreaching party from performing its obligations under the contract.

18. **Contracts: Words and Phrases.** A term can be both the duty to be performed under a contract and a condition precedent to a contractual counterparty's duty.

19. **Contracts: Liability: Damages.** In general, the result of the nonfulfillment of a condition is that the other party's liability is discharged, whereas the nonperformance of a promise gives the other party a damages remedy.

20. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and interpretation will not be used to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

Appeal from the District Court for Loup County: Karin L. Noakes, Judge. Affirmed.

Rodney J. Palmer, of Palmer Law Group, L.L.C., for appellants.

Adam J. Prochaska, of Harding & Shultz, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.

William Weber and Dixie Weber entered into contracts for irrigation water with North Loup River Public Power and Irrigation District (North Loup). The Webers did not make payments due under the contracts prior to the 2010 irrigation season. In June 2010, heavy rains destroyed a diversion dam

which North Loup had utilized to deliver water to the Webers and other irrigators. As a result, North Loup did not deliver any water to the Webers during 2010. The Webers brought this action against North Loup, alleging it breached its contracts to provide irrigation water and was negligent in the performance of those contracts. They claimed damages resulting from decreased crop yields due to the absence of water. The district court for Loup County sustained North Loup's motion for summary judgment, reasoning that the Webers had not fulfilled a condition precedent to North Loup's obligations on the contracts, because the Webers failed to timely pay charges due under the contracts for the 2010 crop year. The Webers perfected this timely appeal. We affirm the judgment of the district court.

## I. BACKGROUND

### 1. FACTS

North Loup was organized in 1933. It manages an irrigation system that includes several diversion dams and canals in Loup, Custer, Garfield, Valley, and Greeley Counties, serving approximately 21,986 acres of farmland. Charges assessed to users of the irrigation system generate all of the revenue collected by North Loup.

The Taylor-Ord Canal (Canal) originates approximately 5½ miles from Taylor, Nebraska, with the Taylor Diversion Dam (Dam). The Dam redirects part of the streamflow of the North Loup River into the Canal, which runs 34 miles to its termination near Ord, Nebraska. At mile 20.05, the Canal merges with the Mirdan Canal, which draws water from the Calamus Reservoir. The portion of the Canal above mile 20.05 is referred to by the parties as the "upper" Taylor-Ord Canal. Farmland along the Canal's path is supplied with water through "turnouts" and underground pipelines.

The Webers have farmed in central Nebraska since 1967. They irrigate eight tracts with water from the upper Canal under contracts with North Loup. The Webers are parties to the contracts for five of the tracts. The contracts for the other three tracts are in the name of Marlene Fuller. The Webers lease these tracts from Fuller on a "share crop" basis, under

which the crop is divided each fall and both parties pay half the irrigation charges.

The terms of each of the contracts are identical except for the description of the land. The following are the portions most relevant to the Webers' claims:

1. [North Loup], upon completion of the Project and the availability of sufficient water, shall furnish water to the Landowner from its system of canals for the purpose of irrigating the irrigable portion or portions of the following described lands . . . during the irrigating season beginning April 1st and ending October 31st in each year . . . . [North Loup] agrees that the amount of water it will make available and deliver to said lands at any one time shall be the proportionate share the irrigable portions of said lands shall be entitled to of all the water demanded and available to [North Loup]. The distribution of such proportionate shares to the Landowner during such year shall constitute a complete performance in said year of the obligations of [North Loup].

2. . . . [T]he Landowner shall pay annually to [North Loup] the sum of $2.50 per acre for each irrigable acre covered by this contract, which sum shall include all charges to the Landowner of every nature, including operating costs for the irrigation of the said lands and for purchase of water rights . . . .

3. The Landowner shall pay to [North Loup] said annual charge on the first day of December of each year . . . . Such annual payment shall be made for the availability of water during the irrigation season immediately succeeding the date of payment . . . .

4. . . . Every installment or other sum of money required to be paid hereunder, which shall remain unpaid for a period of 45 days after the same becomes due, shall bear interest at the rate of six per cent per annum from the date of the expiration of such period of grace.

. . . .

9. [North Loup] shall withhold and stop the delivery of water to the Landowner in the event a default of payments herein required occurs and such default continues

for a period of four months following the due date. Such refusal and withholding of delivery of water shall not affect the Landowner's liability for such overdue payments and all subsequent payments required to be made by him hereunder.

The contracts create the only right the Webers have to water from the Canal.

Irrigators pay an annual charge to North Loup in return for access to water from the Canal. In 2010, the irrigation charge was $32 per acre. This figure is the sum of the $2.50-per-acre rate stated in the contracts and a "Special Emergency Assessment charge" of $29.50 per acre.

The Webers' dispute with North Loup arises from flooding that occurred during June 2010. Beginning on June 7, the area near the Dam began to experience heavy rains that continued throughout the week. By June 12, parts of Loup and Garfield Counties had reported 6 to 10 inches of rainfall. North Loup characterized the resulting deluge down the North Loup River as "catastrophic," "unprecedented," and "a hundred year flood." Measurements approximately 4½ miles downstream from the Dam showed a volume of water more than 4 times the previous high and nearly 30 times the median. Statistical analysis performed by North Loup suggested that, based on the previous 75 years of data, the probability of a similar event occurring again was "much less than one tenth of one percent." On June 11, the flood destroyed the Dam and inflicted significant damage on inlet structures to the Canal.

Due to the extent of the damage, North Loup quickly concluded that water would not be provided to irrigators on the upper Canal during 2010. At a special meeting held on June 15, 2010, North Loup found that it was "obvious the . . . Dam structure is beyond repair or salvage" and that, as a result, it would "not be able to provide service in 2010 to users above the section of the . . . Canal which is combined with the . . . Mirdan Canal." North Loup determined that it would forgo any temporary measures and focus on rebuilding a permanent dam.

At the time of the flood, the Webers had not yet paid their 2010 irrigation charges. The Webers paid their 2010 bill

"under protest" on April 13, 2011. As to why they had not paid earlier, William Weber explained that "I've never wrote [sic] a check for $10,000 in my life that I didn't get something for."

The record indicates that North Loup considered mitigating the burden of 2010 irrigation charges for users on the Canal. Ultimately, however, it refused to waive 2010 charges except for a single tract that had come under contract with North Loup for the first time in April 2010.

## 2. Proceedings Below

The Webers commenced this action on December 29, 2011. In the first count of their complaint, they alleged that North Loup had breached its contracts with them and Fuller. The second count alleged that North Loup had negligently failed to supply water during the 2010 irrigation season. Specifically, the Webers alleged that North Loup negligently failed to "provide irrigation water in any form," "have a contingency plan for irrigating and complying with the irrigation needs . . . in the event of a loss of water at the . . . Dam," "sufficiently block the North Loup River at the . . . Dam in time to supply irrigation water . . . for 2010," and "provide either supplemental well irrigation or pumping stations out of the North Loup River flows for the [Webers]." The complaint alleged that the Webers had suffered $117,626.96 in damages, the bulk of which consisted of reduced yields on their 2010 corn and soybean crops. In its amended answer, North Loup denied wrongdoing or breaching the relevant contracts. It also asserted a number of affirmative defenses, including nonfulfillment of a condition precedent in the contracts.

After conducting an evidentiary hearing on cross-motions for summary judgment, the district court granted North Loup judgment as a matter of law. The court determined that section 3 of the contracts—which states that irrigation charges must be paid by December 1 of the year preceding the irrigation season—created "a condition that must be fulfilled prior to the delivery of water." In addition, the court found that "[s]ection 9 makes it completely clear that [North Loup] was under no duty to deliver water to [the Webers]" and

that, "[i]n fact, the contract[s] require[] [North Loup] [to] stop delivery upon nonpayment." The court concluded that because it was undisputed that the Webers had not paid the 2010 irrigation charges until April 13, 2011, North Loup had no duty under the contracts to deliver water to the Webers during 2010. The court also decided that nonfulfillment of the condition precedent was fatal to the Webers' negligence claim, because "[t]he only argument presented by [the Webers] in support of their 'right' to the delivery of water is based on the contract[s]." The Webers filed this timely appeal, which we moved to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[1]

## II. ASSIGNMENTS OF ERROR

The Webers assign, restated and consolidated, that the district court erred in granting summary judgment in favor of North Loup, because genuine issues of material fact exist regarding (1) their obligation to make advance payment for irrigation water for the 2010 growing season and (2) anticipatory breach by North Loup.

## III. STANDARD OF REVIEW

[1,2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[3]

[3] The meaning of an unambiguous contract is a question of law, in connection with which an appellate court has an

---

[1] Neb. Rev. Stat. § 24-1106 (Reissue 2008).

[2] *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

[3] *Id*.

obligation to reach its conclusions independently of the determinations made by the court below.[4]

## IV. ANALYSIS

### 1. Breach of Contract

North Loup's obligations to the Webers arose from the contracts. When irrigators obtain their water rights by contract, "'[s]uch agreements, generally speaking, are governed by the same rules that pertain to other contracts . . . .'"[5]

### (a) Condition Precedent Not Met

[4,5] The district court determined that North Loup did not breach the contracts, because it had no duty to perform. A breach is the nonperformance of a duty,[6] and performance of a duty subject to a condition cannot become due unless the condition occurs or its nonoccurrence is excused.[7] A "'"condition precedent"'" includes "'a condition which must be fulfilled before a duty to perform an existing contract arises.'"[8]

[6-8] Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract.[9] Where the parties' intent is not clear, the language is generally interpreted as promissory rather than conditional.[10] Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," "on condition that," or some

---

[4] See *Braunger Foods v. Sears*, 286 Neb. 29, 834 N.W.2d 779 (2013).

[5] *Faught v. Platte Valley Public Power & Irrigation Dist.*, 155 Neb. 141, 149, 51 N.W.2d 253, 258 (1952). See, also, 45 Am. Jur. 2d *Irrigation* § 37 (2007).

[6] *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002).

[7] *Turbines Ltd. v. Transupport, Inc.*, 285 Neb. 129, 825 N.W.2d 767 (2013).

[8] *Donaldson v. Farm Bureau Life Ins. Co.*, 232 Neb. 140, 145, 440 N.W.2d 187, 190 (1989), quoting *Schmidt v. J. C. Robinson Seed Co.*, 220 Neb. 344, 370 N.W.2d 103 (1985).

[9] See *Estate of Stine v. Chambanco, Inc.*, 251 Neb. 867, 560 N.W.2d 424 (1997).

[10] See *Harmon Cable Communications v. Scope Cable Television*, 237 Neb. 871, 468 N.W.2d 350 (1991).

similar phrase are evidence that performance of a contractual provision is a condition.[11] However, the presence or absence of these terms is not determinative:

> No particular form of language is necessary to make an event a condition, although such words as "on condition that," "provided that" and "if" are often used for this purpose. An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language. Whether the parties have, by their agreement, made an event a condition is determined by the process of interpretation.[12]

It is evident from the unambiguous language of the contracts that the parties intended to condition North Loup's obligation to supply water in 2010 on the Webers' payment of irrigation charges by the start of the 2010 irrigation season. Section 3 of the contracts provides: "The Landowner shall pay to [North Loup] said annual charge on the first day of December of each year . . . . Such annual payment shall be made for the availability of water during the irrigation season immediately succeeding the date of payment . . . ." The contracts further state that "[North Loup] shall withhold and stop the delivery of water to the Landowner in the event a default of payments herein required occurs and such default continues for a period of four months following the due date." Four months from December 1 is April 1, which the contracts define as the beginning of the irrigation season and the commencement of North Loup's performance. Thus, the contracts required the Webers to perform first and conditioned North Loup's obligations on that prior performance.

The Webers admit that they made no payment to North Loup in 2010. They did not pay the 2010 irrigation charges until April 13, 2011. Payment by April 1, 2010, was a condition precedent to North Loup's contractual duty to supply water to the Webers during the 2010 irrigation season. Because no such payment was made, North Loup's duty under the contracts

---

[11] *Id.*

[12] Restatement (Second) of Contracts § 226, comment *a*. at 170 (1981).

never came to fruition during the 2010 season and, without a duty to perform, it did not breach the contracts as a matter of law.[13]

### (b) Condition Precedent
### Was Not Waived

The Webers argue that summary judgment was inappropriate because there are genuine issues of material fact as to whether North Loup waived the condition precedent. They argue that North Loup never decided "whether the [2010] assessments or interest would be waived" for all irrigators affected by the 2010 flood and that, therefore, it "was a question of fact to be determined if the assessments were due where no irrigation water was received."[14]

[9-12] Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.[15] In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such purpose, or acts amounting to estoppel on his or her part.[16] A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive.[17] Conditions precedent in a contract may be waived.[18]

The record reflects that during 2010 and 2011, North Loup considered various requests and proposals to relieve irrigators of 2010 irrigation charges and interest. But North

---

[13] See, generally, *Empfield v. Ainsworth Irr. Dist.*, 204 Neb. 827, 286 N.W.2d 94 (1979).

[14] Brief for appellants at 19.

[15] *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010).

[16] *Id.*

[17] *Id.*

[18] *Pearce v. ELIC Corp.*, 213 Neb. 193, 329 N.W.2d 74 (1982).

Loup waived the 2010 irrigation charges for only one irrigator. That irrigator had signed a contract in April 2010 for a tract that had not previously been under contract with North Loup. The irrigator had paid a $15-per-acre "Debt Retirement Assessment" and had spent $10,000 laying underground irrigation pipe in anticipation of drawing water from the Canal. Apparently in light of these circumstances, North Loup agreed to waive this irrigator's 2010 irrigation charges. Even this irrigator, however, paid 2010 irrigation charges for his other tracts of land that had previously been under contract with North Loup.

Here, the contracts required the Webers and all water users to pay before they received irrigation water. Section 3 of the contracts makes payment of irrigation charges due December 1, and section 9 provides that North Loup will withhold delivery of water if a user has not paid by the start of the irrigation season. William Weber admitted that even if rainfall was plentiful and he did not draw any water from the Canal, he was still obligated to pay the irrigation charges. North Loup consistently referred to unpaid irrigation charges as "delinquent." The isolated waiver of irrigation charges for the single tract which was newly brought under contract does not create a question of fact as to whether North Loup waived the condition precedent in its contract with the Webers.

### (c) No Anticipatory Breach

[13-15] The Webers argue that North Loup anticipatorily breached the contracts, "making the need for payment a question of fact." An anticipatory breach of a contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evidencing an intention to refuse performance in the future.[19] The words or acts that form the basis of an anticipatory breach must amount to an unequivocal repudiation of the contract.[20] Where performances are to be exchanged under an exchange

---

[19] *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006).

[20] See *id.*

of promises, one party's repudiation of a duty to perform discharges the other party's remaining duties to perform.[21]

The Webers premise their claim of anticipatory breach upon North Loup's decision to rebuild a permanent diversion dam without endeavoring to supply water to users on the upper portion of the Canal during the 2010 season. They argue that the district court "overlooked the fact that [North Loup] committed an anticipatory breach of contract on June 15, 2010 when it decided not to provide water to the irrigators but to pursue building a new dam instead of a temporary one, even though[] they had no assessment of the damages yet."[22] Thus, the actions by North Loup which are alleged to constitute an anticipatory breach occurred more than 2 months after the start of the irrigation season. As noted, payment of 2010 irrigation charges by April 1, 2010, was a condition precedent to North Loup's duty to deliver water.

[16,17] North Loup did not anticipatorily breach the contracts because, by failing to pay the 2010 irrigation charges, the Webers themselves breached the contracts prior to North Loup's purported anticipatory breach. Generally, a party who has failed or refused to perform the terms and conditions imposed upon him by a contract, or has not been ready, willing, and able to perform the same, cannot recover for a breach thereof by the other party.[23] A material breach will excuse the nonbreaching party from performing its obligations under the contract.[24]

[18,19] A term can be both the duty to be performed under a contract and a condition precedent to a contractual counterparty's duty. We have in the past distinguished "conditions" from "promises."[25] In general, the result of the nonfulfillment

---

[21] *Anderson Excavating v. SID No. 177*, 265 Neb. 61, 654 N.W.2d 376 (2002).

[22] Brief for appellants at 20.

[23] *Chadd v. Midwest Franchise Corp.*, 226 Neb. 502, 412 N.W.2d 453 (1987).

[24] *Gary's Implement v. Bridgeport Tractor Parts*, 270 Neb. 286, 702 N.W.2d 355 (2005).

[25] *Harmon Cable Communications v. Scope Cable Television, supra* note 10.

of a condition is that the other party's liability is discharged, whereas the nonperformance of a promise gives the other party a damages remedy.[26] Section 225 of the Restatement (Second) of Contracts, however, recognizes that a particular clause can have a dual capacity: "Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur."[27] The commentary explains that "[t]he same term may . . . be interpreted not only to make an event a condition of the obligor's duty, but also to impose a duty on the obligee that it occur."[28]

Payment of the 2010 irrigation charges by April 1 was both the contractual performance required of the Webers and a condition precedent to North Loup's duty to perform. Nonpayment cannot be considered an immaterial breach, because there was little else the Webers were obligated to do. The contracts required that the Webers perform first and conditioned North Loup's performance on the Webers' payment. The Webers' failure to pay was therefore both a nonfulfillment of a condition relieving North Loup of its duty to perform and a material breach of contract that occurred prior to North Loup's alleged anticipatory breach and independently relieved North Loup of any duty to perform. The Webers' claim of anticipatory breach is without merit as a matter of law.

## 2. Negligence

The contracts were the sole source of any duty on the part of North Loup to supply water to the Webers. Assuming without deciding that a negligence claim was ever viable under the circumstances of this case,[29] we agree that it failed as a matter of law because North Loup owed no duty to the Webers. As noted, the contractual duty to supply water never arose in 2010, because the Webers failed to pay the 2010 irrigation charges

---

[26] *Id*.

[27] Restatement, *supra* note 12, § 225(3) at 165.

[28] *Id*., § 225, comment *d*. at 168.

[29] See *Lesiak v. Central Valley Ag Co-op*, 283 Neb. 103, 808 N.W.2d 67 (2012) (explaining doctrine of economic loss).

prior to the growing season. If no duty existed, no duty could have been breached.

The Webers argue that North Loup violated a criminal statute, Neb. Rev. Stat. § 46-263 (Reissue 2010), which provides:

> Any person having charge of a ditch or canal used for irrigation purposes, who shall neglect or refuse to deliver water as herein provided, or any person or persons who shall prevent or interfere with the proper delivery of water to the person or persons having the right thereto, shall be guilty of a Class III misdemeanor.

North Loup argues that § 46-263 is inapplicable, because it is a criminal statute imposing a criminal penalty and it applies to "'persons'" rather than "public entities."[30] We have recognized that a violation of a statute which imposes a criminal penalty can be evidence of negligence,[31] and although this court has not addressed the question, other jurisdictions have held that the term "person" in a criminal statute may be applied to corporations.[32]

[20] But there could be no violation of § 46-263 by North Loup here, because the statute does not apply to persons who neglect or refuse to deliver water to those having no right to the water. Statutory language is to be given its plain and ordinary meaning, and interpretation will not be used to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[33] Because North Loup had no duty to deliver water to the Webers during the 2010 irrigation season, it did not "prevent or interfere with the proper delivery of water to the person or persons having the right thereto." Similarly, North Loup did not "neglect or refuse to deliver water" within the meaning of § 46-263. We have recognized that the existence of a statute may be relevant to duty in addition to breach,[34] but the construction urged upon this court by the Webers would

---

[30] Brief for appellee at 43.

[31] See, e.g., *Schaefer v. McCreary*, 216 Neb. 739, 345 N.W.2d 821 (1984).

[32] See 18B Am. Jur. 2d *Corporations* § 1839 (2004).

[33] See *ML Manager v. Jensen*, 287 Neb. 171, 842 N.W.2d 566 (2014).

[34] See *Kozicki v. Dragon*, 255 Neb. 248, 583 N.W.2d 336 (1998).

lead to absurd results. Due to their failure to fulfill a condition precedent, the Webers were effectively in no different position during the 2010 season than the area farmers who had no contract at all with North Loup. It cannot be assumed that the Legislature intended to impose criminal liability on persons who refuse to deliver water to those who have no right to receive it.

We conclude that the district court did not err in determining that North Loup was entitled to judgment as a matter of law with respect to the Webers' claims.

## V. CONCLUSION

For the reasons discussed, we affirm the judgment of the district court.

AFFIRMED.