IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

MALLORY FIRE PROTECTION SERVS. V. MCSHANE CONSTR. CO.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MALLORY FIRE PROTECTION SERVICES, INC., APPELLEE AND CROSS-APPELLANT,

V.

MCSHANE CONSTRUCTION COMPANY, LLC, APPELLANT AND CROSS-APPELLEE.

Filed October 3, 2017.    No. A-16-752.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

David J. Koukol and Michael W. Milone, of Koukol & Johnson, L.L.C., for appellant

John A. Svoboda, of Gross & Welch, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

McShane Construction Company, LLC (McShane) appeals and Mallory Fire Protection Services, Inc. (Mallory), cross-appeals from an order entered by the district court after a bench trial which found in favor of McShane for its breach of contract claim, but also found that the contract was divisible and that Mallory had substantially performed under the contract. On appeal, McShane argues the district court erred in its construction and application of the contract, finding that it failed to prove a portion of its damages, dismissing its negligence claims, not admitting proper evidence, and finding that the contract was divisible and that Mallory substantially performed under the contract. On cross-appeal, Mallory argues the district court erred by failing to award damages for work it performed and failing to award prejudgment interest on the work it performed. For the reasons set forth below, we affirm.

- 1 -

## II. BACKGROUND

McShane was the general contractor for the construction of the Springs at Legacy Commons Apartments (the Project). The Project involved the construction of a seven building apartment complex in Omaha, Nebraska. Mallory was the successful bidder for the fire suppression system subcontract on the Project. On June 8, 2012, McShane and Mallory entered into a subcontract agreement (Agreement) for the design and installation of a fire suppression system in each of the seven buildings. The Agreement provided that Mallory would be paid $345,000.00 for its costs and labor on the Project. A subsequent change order on February 5, 2013, increased the total payment by $28,565.00, for a total subcontract value of $373,565.00.

The Agreement provided that Mallory would be paid by submitting a monthly estimate of the work completed pursuant to the General Conditions of Subcontract (General Conditions), which was incorporated into the Agreement. The General Conditions provided that McShane would only make payments to Mallory after McShane had received payments from the owner of the Project. The owner of the Project was not a party in this matter. The Agreement and General Conditions provided the time frame in which the Project needed to be completed and mandatory conditions Mallory must have met. The General Conditions included provisions that allowed McShane to withhold payments from Mallory if Mallory did not meet its contractual obligations.

The construction of the Project began in summer 2012 and occurred sequentially, with work beginning on Building 1. Buildings 1-3 were completed by Mallory without issue. Building 1 received its certificate of occupancy, which is received when the building has passed its final inspection, on December 21, 2012. Building 2 received its certificate of occupancy on January 14, 2013, and Building 3 received its certificate of occupancy on March 1, 2013.

Buildings 1-3 and 7 were classified under regulations published by the National Fire Protection Agency (NFPA) as NFPA-13R buildings. The NFPA governs the codes for fire sprinkler installation and at the time of this matter the City of Omaha had adopted the 2002 edition of the NFPA code. NFPA-13R buildings are designated as residential buildings. Buildings 4-6 in the Project were designated as NFPA-13 buildings. NFPA-13 buildings are designated as commercial buildings. The key differences between NFPA-13R and NFPA-13 buildings are: (1) NFPA-13 buildings require a sprinkler system in the attic of the building, and (2) NFPA-13 buildings require either a sprinkler system or complete insulation in the interstitial spaces of the building. Interstitial spaces are the areas between the ceiling of the lower level of a building and the framing of the next level of the building.

In January 2013, issues with the Project began to arise while Mallory was working on Buildings 4 and 5. The Omaha Fire Department discovered that the interstitial spaces in Buildings 4 and 5 did not have sprinkler systems. The bid submitted by Mallory included the installation of a sprinkler system in the interstitial spaces in Buildings 4-6. However, the design plans for Buildings 4-6 did not include sprinkler systems in the interstitial spaces. Mallory initially disputed whether they were responsible for the installation of the system in the interstitial spaces, but eventually agreed to remedy the problem. Mallory installed sprinklers in the interstitial spaces of Building 4 and had partially installed sprinklers in the spaces of Building 5 when McShane opted to fill the interstitial spaces with insulation in Buildings 4-6.

The parties' relationship further deteriorated between February and March 2013. Mallory submitted invoices to McShane for work performed, but McShane ceased paying the requested amounts. According to Mallory, they left the jobsite on March 8, 2013, because of non-payment. McShane signed a contract with another fire suppression company, Continental Fire Sprinkler Company (Continental), the day before Mallory left the jobsite. McShane contracted with Continental to examine, evaluate, repair, and complete the design and installation of the fire sprinkler systems in Buildings 4-7. Continental worked on the Project for approximately three weeks. Continental encountered issues with the use of Mallory's designs, as well as deficiencies in the work completed by Mallory and submitted a new proposal to McShane to perform remedial measures and complete the Project. After receiving the new proposal, McShane determined that it would be best for both McShane and Mallory if Mallory could return to the jobsite to finish the Project.

The issues encountered by Continental were substantial. Continental discovered that some of the pipes installed were not the size called for in the design plan. This had occurred within the walls of the buildings and in the attic spaces. Additionally, Continental discovered that the main risers in the buildings were not the correct size.

The parties exchanged emails about Mallory returning to the Project in late March 2013. McShane requested that Mallory perform the necessary remedial work and to complete Buildings 4-6. McShane agreed that upon final inspection of the buildings, it would pay Mallory $130,604.54 for the completed work. Mallory agreed to provide the revised engineering plans to McShane before receiving payment, perform the remedial work, and complete the buildings.

Mallory hired a new engineer, Craig Taschner, to redesign the installation plans for the buildings. Taschner's new plans called for a major overhaul because he discovered the previous design plans were not NFPA compliant. Some of the installed pipe needed to be replaced, some locations required different sprinkler heads, and some units required an additional wall to hide the pipe feeding into the attic system. A few units with two-car garages needed to be converted into one-car garages with a fire door replacing the installed door. Additionally, the RPZ backflow prevention valve in the buildings needed to be removed and another prevention valve needed to be installed.

Mallory returned to the jobsite in late March 2013 to perform its duties under the Agreement. In order for Mallory to perform remedial work on Buildings 4 and 5, drywall had to be removed and then replaced. At the time of the remedial work, the apartments in Building 4 were finished completely with carpeting, paint, cabinetry, and appliances. The apartments in Building 4 were in move-in condition before the remedial work began. Building 5 was two weeks behind Building 4, but it was near move-in condition at the time Mallory began its remedial work. Building 6 was about one month behind Building 5, and did not have any drywall hung at the time Mallory began its work.

Mallory completed all of its work on Buildings 4-6 around May 22, 2013. Building 4 received its certificate of occupancy on April 30, 2013, Building 5 received its certificate of occupancy on May 9, 2013, and Building 6 received its certificate of occupancy on June 28, 2013. Building 6 passed its fire sprinkler system inspection on May 22, 2013. On May 21, 2013, Mallory requested payment for the work it performed on Buildings 4-6. On May 22, 2013, McShane

responded by informing Mallory that it would not be paid until the final inspections, which would occur in roughly 30 days. Mallory was beginning work on Building 7, but upon learning that it would not be paid for its completed work, walked off the jobsite permanently.

After Mallory left the Project, it filed a construction lien on the property. Two of Mallory's suppliers, Ferguson Supply and Howell's Fab., also filed construction liens on the Project for nonpayment. McShane posted a bond to have Mallory's lien taken off the Project, negotiated with Ferguson Supply to have it assign its claim against Mallory to McShane, and paid off the Howell's Fab. construction lien.

Mallory filed suit for breach of contract against McShane on June 19, 2013. McShane filed its answer and counterclaim for breach of contract on July 22, 2013. McShane alleged that as a result of Mallory's breach of their agreement, Mallory owed damages resulting from the following: the insulation of the interstitial spaces, Continental's services for remediation work, drywall remediation and repair, painting, cleaning, temporary labor, owner damages, extended general conditions damages, time management fees, owner's nonpayment, management travel expenses, design review fees, construction liens, overhead and profit, electricity costs, additional building requirements, and additional sprinkler repair. The matter proceeded to a bench trial on January 11, 2016, and concluded on January 15, 2016. A number of witnesses testified at trial. We will discuss specific testimony as it becomes relevant in the analysis of this opinion.

After trial, the district court determined that Mallory initially breached the Agreement in two material ways. First, Mallory breached by failing to install the interstitial sprinkler heads in a timely manner in Buildings 4 and 5. Second, the court found that Mallory breached the Agreement by walking off the Project in March 2013. The court found that the March 2013 emails between the parties was a clarification of the duties owed to each other under the contract. Finally, the court determined that Mallory breached the Agreement for a second time when it left the jobsite in May 2013.

The district court determined that Mallory owed McShane $132,169.27 in damages for portions of the remediation work McShane paid for as a result of Mallory's breach. The district court also determined that the Agreement was divisible, that Mallory had substantially performed under the Agreement, and that McShane owed Mallory $130,604.54 for the work Mallory had performed.

## III. ASSIGNMENTS OF ERROR

Restated, reordered, and consolidated, McShane argues the district court erred in (1) its construction and application of the contract; (2) finding McShane failed to prove a portion of its damages with reasonable certainty and by the greater weight of the evidence; (3) finding the contract was divisible and that Mallory had substantially performed under the contract; (4) dismissing McShane's negligence claims against Mallory; and (5) not admitting specific evidence. On cross-appeal, Mallory argues the district court erred in (1) failing to award damages under the change order; (2) failing to award damages for work performed on Building 7; and (3) failing to award prejudgment interest.

## IV. STANDARD OF REVIEW

A suit for damages arising from breach of a contract presents an action at law. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Anderson Excavating v. SID No. 177*, 265 Neb. 61, 654 N.W.2d 376 (2002). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). An appellate court will not reevaluate the credibility of the witnesses or reweigh testimony but will review the evidence for clear error. *Id.*

## V. ANALYSIS

### 1. CONTRACT

#### (a) Construction and Application of Contract

McShane argues the district court erred in its interpretation of the contract between the parties. McShane specifically argues that there was no waiver or modification of the contract. Mallory argues that the district court was correct in its interpretation that the email communication in March 2013 was a "clarification" of the parties' duties under the contract and was enforceable.

The construction of a contract is a question of law, and is reviewed de novo. *Labenz v. Labenz*, 291 Neb. 455, 866 N.W.2d 88 (2015). Ordinarily, to establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose, or acts amounting to an estoppel on his or her part. *D & S Realty v. Markel Ins. Co.*, 280 Neb. 567, 789 N.W.2d 1 (2010). A party may waive a written contract in whole or in part, either directly or inferentially. *Id.* A party may prove the waiver by: (1) a party's express declarations manifesting the intent not to claim an advantage or (2) a party's neglecting and failing to act so as to induce the belief that it intended to waive. *Id.* After a breach of contract, modification of that contract requires new consideration. *Selig v. Wunderlich Contracting Co.*, 160 Neb. 215, 69 N.W.2d 861 (1955).

The district court found that the March email exchange between the parties was a clarification of the duties owed to one another. Scott Hoppa, senior vice president at McShane emailed Mallory's legal counsel on March 28, 2013. Hoppa agreed that if Mallory would perform the necessary remedial work and complete Buildings 4-6, that upon final inspection of the buildings, McShane would pay Mallory $130,604.54 for the completed work. Mallory agreed to provide the revised engineering plans, perform the remedial work, and complete the buildings before receiving payment. Mallory had previously been paid $169,516.00 for its work prior to March 2013. Hoppa testified that prior to the March email exchange, McShane had been paid $300,120.00 by the owner for the work completed on the sprinkler systems for the Project. The total sum to be paid to Mallory upon remedy and completion of Buildings 4-6 equals the total amount of money the owner had paid McShane for the progress on the sprinkler system to that date.

Upon our de novo review, we find the district court did not err in its construction and application of the contract. The district court explicitly stated in its order, "[T]he Court finds that this email exchange to merely be the parties clarifying to each other the duties that they owed each

other under the Agreement." The district court did not find that the email exchange waived McShane's rights under the contract. Instead, the district court simply determined the parties understood how the duties imposed by the contract on each of them would be performed. McShane can demonstrate no prejudice because even if the district court decision is read to have determined McShane had waived Mallory's first breach for purposes of paying Mallory, the district court still found that Mallory's breach should result in an award of damages to McShane.

### (b) Breach of Contract

A breach of contract is the nonperformance of a duty. *Weber v. North Loup River Pub. Power*, 288 Neb. 959, 854 N.W.2d 263 (2014). In interpreting a contract, a court must determine, as a matter of law, whether that contract is ambiguous. *Gibbons Ranches v. Bailey*, 289 Neb. 949, 857 N.W.2d 808 (2015). A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. *Id.*

Section 13.1.1 of the General Conditions provides, "[Mallory] shall be in default and material breach of this Agreement if any of the following occur at any time. . . . [Mallory] refuses or fails, except in cases for which extension of time is provided, to supply enough properly skilled workers or proper material to meet all aspects of the current schedule. . . ." The district court found that Mallory breached the Agreement between the two parties when Mallory walked off the Project in May 2013 and never returned. The district court found that there was no breach of the Agreement by McShane. We determine that the Agreement was not ambiguous. We further agree with the district court that Mallory breached the Agreement through its May 2013 departure and that there was no breach on the part of McShane.

### 2. MALLORY'S CLAIMS

### (a) District Court's Award of $130,604.54

As previously discussed, the district court found that the email exchange was not a modification of the Agreement, but a clarification of terms. Based on that finding, the court proceeded to analyze whether Mallory was entitled to payment for the work completed after its return to the jobsite. The district court ultimately determined that the Agreement was divisible and that Mallory had substantially performed under the contract.

### (b) Divisibility

The question of whether a contract is divisible is a finding of fact. In a bench trial in an action at law, a finding of fact will not be set aside unless clearly wrong. *Honstein Trucking v. Sandhills Beef, Inc.*, 209 Neb. 422, 308 N.W.2d 331 (1981). Generally speaking, the test is that where there are several undertakings, each supported by a distinct consideration, the contract is severable. *Gaspar v. Flott*, 209 Neb. 260, 307 N.W.2d 500 (1981). Whether a contract is entire or several is a question of intentions apparent in the instrument. *Id.* In an unambiguous contract, it is to be determined from the language, the subject matter, and the construction placed upon it by the

parties in light of the surrounding circumstances. *Id.* A contract which in its nature and purpose is susceptible of division and apportionment is divisible and severable. *Id.*

The district court found that the Agreement was divisible because the seven total buildings were assigned specific monetary amounts for the completion of each building. The district court went on to find that Mallory had substantially completed the contract, leaving only Building 7 unfinished. Upon our review, we find that the Agreement was not divisible. Our review of the Agreement does not reveal that each of the buildings was individually assigned a specific monetary value for the work performed. Rider "B" to the contract prescribes the total payment of $345,000.00 for the completion of work on seven buildings total. While the buildings in the Project were constructed sequentially, with Mallory receiving payment after submitting an invoice for the work it performed, payment occurred based on monthly estimates of work completed provided by McShane to the owner. McShane, once paid, was to disburse the amount received for work completed within seven days so long as Mallory was not in default of the contract provisions (less 10 percent retainage). This finding does not end our analysis however.

To successfully bring an action on a contract, a plaintiff must first establish that the plaintiff substantially performed the plaintiff's obligations under the contract. *RN Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016). To establish substantial performance under a contract, any deviations from the contract must be relatively minor and unimportant. *Id.* If there is substantial performance, a contract action may be maintained, but without prejudice to any showing of damage on the part of the defendant for failure to receive full and complete performance. *Id.*

Where there is a lack of substantial performance, but there has been a part performance and it has been of substantial benefit to the other party and he or she has accepted and retained the benefits thereof, he or she should not be permitted entirely to avoid the duties assumed by him or her under his or her contract, and, under such circumstances, the party partially performing is entitled to recover the reasonable or fair value of such performance, subject to the reciprocal right of the other party to recoup such damages as he or she has suffered from the failure of the part-performing party to perform fully or substantially his or her contract. *Id.*

As stated above, Mallory was in breach of the Agreement when it left the jobsite in May 2013, leaving Building 7 partially completed. However, Mallory had completed work on Buildings 1-3 as well as the remedial and final installation work in Buildings 4-6 before leaving. Their work on all six buildings had passed inspections by City of Omaha officials. Based on these events, we find that at minimum Mallory had partially performed its obligations under the contract resulting in a substantial benefit to McShane. McShane thereafter accepted and retained the benefits of Mallory's work on Buildings 1-6. Therefore, Mallory is entitled to recover the reasonable fair value of their performance.

The district court's award of $130,604.54 to Mallory reflected the parties' own clarification of the amount that would be payable upon the completion of Buildings 4-6. We cannot say that the award granted to Mallory was clearly wrong. While our reasoning varies somewhat from that of the district court, we nevertheless affirm the result. An appellate court will affirm a lower court's ruling that reaches the correct result, although based on different reasoning. *Latzel v. Bartek*, 288 Neb. 1, 846 Neb. 153 (2014).

(c) Change Order

Mallory argues the district court erred by failing to award it damages for the work performed on the change order for Buildings 1-3. The change order was executed by the parties on February 5, 2013, and received into evidence as Exhibit 24. In its order, the district court recited that in its complaint Mallory was seeking a total of $181,694.00 in damages.

The district court entered judgment in favor of Mallory for the $130,604.54 "based on the email exchange." Having reviewed the record, we find no clear error in the district court's findings. While there was evidence adduced that Mallory performed the work contemplated by the change order on Buildings 1-3, there is also evidence that Continental performed work on Buildings 4-6 during Mallory's first absence from the jobsite. Mallory produced little, if any, evidence of the value of any further work it performed beyond what was agreed to in the parties' email exchange. This being a case involving partial performance, the burden was on Mallory to prove the reasonable fair value of their performance. The district court was not clearly wrong in determining that Mallory failed to do so beyond the amount recited in the email exchange.

(d) Building 7

Mallory assigned as error that the district court erred by failing to award it damages for the work it performed on Building 7. In its brief, Mallory's only argument concerning this assignment of error was, "In addition, the Court should have awarded Mallory damages for its work on building 7. Mallory completed 75 percent of the fire sprinkler installation work on building 7."

Appellants are required to point out the factual and legal bases that support their assignments of error. *Marcuzzo v. Bank of the West*, 290 Neb. 809, 862 N.W.2d 281 (2015). Further, an argument that does little more than restate an assignment of error does not support the assignment, and an appellate court will not address it. *Id.* We find that this assignment of error was only marginally argued. Therefore it is difficult to assess the merits of the argument. Even assuming that this was sufficient argument for the assignment of error, the deficiencies discussed above as to the change order are equally applicable to Building 7. The district court was not clearly wrong in determining that Mallory should not recover for the work it performed on Building 7.

(e) Prejudgment Interest

Mallory argues the district court erred in refusing to award it prejudgment interest on its claim. Mallory argues that Neb. Rev. Stat. § 45-104 (Reissue 2010) is the applicable statute because the controversy between the parties involved an instrument in writing.

Two recent opinions authored by the Nebraska Supreme Court have contemplated the interplay between § 45-104 and Neb. Rev. Stat. § 45-103.02 (Reissue 2010). In *BSB Constr. v. Pinnacle Bank*, 278 Neb. 1027, 776 N.W.2d 188 (2009), the court analyzed whether a party should have been awarded prejudgment interest under § 45-104 and § 45-103.02 and determined that neither section allowed an award of prejudgment interest. Similarly, in *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013), the Nebraska Supreme Court analyzed the award of prejudgment interest under both statutes. In deciding which statute to apply, the court stated, "[w]e see no need to resolve this issue because we conclude this case is not a type enumerated under § 45-104. So regardless which approach is correct, whether prejudgment interest

is proper depends on whether this case presented a reasonable controversy." 285 Neb. at 171, 825 N.W.2d at 791.

In the most recent Nebraska Supreme Court opinion discussing the award of prejudgment interest, the court determined that prejudgment interest may be awarded only as provided in § 45-103.02. *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015). The court cited with approval to *Brook Valley Ltd. Part., supra*, and determined there was a reasonable controversy over the right to recover. *Id.*

In an abundance of caution, we will address whether Mallory qualifies for prejudgment interest under § 45-104 while being mindful that an analysis under § 45-103.02 would still be required. Section 45-104 provides:

> Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment.

We determined above that Mallory is recovering under a theory of partial performance, not an instrument in writing. Therefore, none of the enumerated instances in § 45-104 are applicable. Even if we were to find § 45-104 applicable, § 45-103.02(2) provides, in relevant part, that "interest as provided in section 45-104 shall accrue on the unpaid balance of liquidated claims from the date the cause of action arose until the entry of judgment."

Under § 45-103.02(2), prejudgment interest is recoverable only when the claim is liquidated, that is, when there is no reasonable controversy as to the plaintiff's right to recover and the amount of such recovery. *Roskop Dairy, supra.* This determination requires a two-pronged inquiry. *Archbold v. Reifenrath*, 274 Neb. 894, 744 N.W.2d 701 (2008). There must be no dispute as to the amount due and to the plaintiff's right to recover. *Id.*

There was clearly a dispute as to whether Mallory was entitled to recover any damages due to their breach of the Agreement. Moreover, the amount of any potential recovery was controverted. Indeed, the recovery determined by the district court and affirmed herein is less than the amount prayed for. Therefore, we find the district court did not err in refusing to award prejudgment interest.

### 3. MCSHANE'S COUNTERCLAIM FOR DAMAGES

The district court found that Mallory's breach did result in damages to McShane. Specifically, the court found that the following expenses incurred by McShane due to Mallory's breach were proven:

> McShane is awarded the following damages: $67,914.00 for interstitial insulation, $54,499.88 for drywall remediation and repair, $4,500.00 for painting services, $2,466.32 for cleaning services, and $2,789.07 for temporary labor. This is $132,169.27 total damages awarded to McShane.

The court rejected numerous other claims for a variety of reasons fully set out in its opinion that will be addressed individually hereafter.

McShane argues the district court erred by failing to find that McShane had proved portions of its damages with reasonable certainty and by the greater weight of the evidence. Mallory argues the district court did not err and that the district court is the sole judge of credibility of the witnesses. Important to many of the rejected claims are evidentiary rulings made by the district court. We will address these rulings first, and then address McShane's individual claims.

(a) Evidentiary Rulings

McShane argues the district court erred by excluding testimony from the owner of the Project regarding its claim against McShane and by not receiving Exhibit 176, its "compendium" of documentary damages.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules. Judicial discretion is a factor only when the rules make such discretion a factor in determining admissibility. *ACI Worldwide Corp. v. Baldwin Hackett & Meeks*, 296 Neb. 818, 896 N.W.2d 156 (2017). To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about evidence admitted or excluded. *Id.* The exercise of judicial discretion is implicit in determining the relevance of evidence, and we will not reverse a trial court's decision regarding relevance absent an abuse of discretion. *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

McShane argues the district court erred by excluding the testimony of Angelo Eguizabal, a representative of the owner of the Project regarding the owner's claims against McShane for lost rents due to the delay in the Project. The district court determined that since the contract between the owner and McShane was never produced, the testimony was not relevant and damages thereafter would not be reasonably certain. These damages stem from a lawsuit by the owner against McShane in a case that was not before the district court. Upon our review, we agree with the district court's rationale and find that the district court did not abuse its discretion in excluding testimony from the owner of the Project.

Next, McShane argues the district court erred by sustaining a hearsay objection to Exhibit 176 because its witnesses had compiled the exhibit and possessed direct personal knowledge of its contents as a business record. Neb. Rev. Stat. 27-803(5) (2016) provides the following documents are not excluded by the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, made at or near the time of such acts, events, or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness unless the source of information or method or circumstances of preparation indicate lack of trustworthiness. The

circumstances of the making of such memorandum, report, record, or data compilation, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight.

It is of note that the district court allowed McShane to utilize Exhibit 176 to refresh the recollection of witnesses but did not allow its admission. Upon our review, we find that the district court did not abuse its discretion by sustaining a hearsay objection to Exhibit 176. This document was created exclusively for the purpose of litigation and would not have been created in the normal course of business for McShane. We note that many of the documents attached to the compendium could have been admissible under the business records exception, these documents were not created by McShane. No witnesses were produced who could lay the proper foundation as records custodians for them to be received under the hearsay exception. Therefore, we find no error on the part of the district court.

(b) Damage Claims

In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642, 748 N.W.2d 626 (2008). While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Dutton-Lainson Co. v. Continental Ins. Co.*, 279 Neb. 365, 778 N.W.2d 433 (2010). The proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness. *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006). The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Dutton-Lainson Co., supra*.

The district court began its trial findings by stating, "The majority of the facts in this case are heavily disputed. The Court finds the following statement of facts to be credible based upon its review of the evidence and consideration of live trial testimony." In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Donut Holdings v. Risberg*, 294 Neb. 861, 885 N.W.2d 670 (2016). We will analyze each of McShane's claimed errors for damages in the subsections below.

*(i) Drywall Remediation and Repair*

McShane argues the district court erred in not awarding it the total amount alleged in drywall remediation and repair damages, which it claims totaled $62,582.93. The district court awarded McShane $54,499.88 in damages for the drywall remediation and repair in Buildings 4-5. The district court deducted $8,082.12 from the change order in Exhibit 165 because John Anderson Jr., the owner of Anderson Drywall, testified that his company installed drywall in Building 4 twice due to McShane not inspecting the work before the drywall was put in place. Upon our

- 11 -

review, we find that the district court's finding was supported by the evidence adduced. The court was not clearly wrong in denying this cost.

### (ii) Temporary Labor Costs

McShane argues the district court erred in not awarding it the total amount alleged for temporary labor services to assist the remediation work in Buildings 4 and 5, which it claims totaled $26,676.00. The district court received into evidence Exhibit 175, which were invoices from Labor Ready's representative. The district court also heard testimony from Mark Bowermeister, assistant superintendent of the Project, who had prepared a daily manpower report, Exhibit 163, for the labor related to the "sprinkler system changes." The district court determined that Labor Ready only performed work relating to the "sprinkler system changes" for portions of 11 days. The court determined the only invoices that were reasonably certain were from April 5th, 26th, and May 3rd. These invoices totaled $2,789.07. Upon our review, only the invoices dated April 5, April 26, and May 3 relate to dates listed by Bowermeister as relating to the remediation. We were able to determine that the district court arrived at its damages figure by factoring the amount of work hours logged by Bowermeister and the standard rate that Labor Ready charged for its services. Therefore, we find the district court was not clearly wrong in its award.

### (iii) Owner Damages

McShane argues the district court erred in not awarding it the amount alleged for damages of money withheld by the owner of the Project against McShane. The district court found these damages were too remote as there was no evidence of the contract between McShane and the owner of the Project. The contract between McShane and the owner was never produced in discovery and the damages allegedly incurred by McShane were not reasonably certain. The district court also noted in its opinion that there was testimony regarding a pending insurance claim for this alleged amount, which was not further elaborated on. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with the owner of the Project, as this claim was too remote and speculative to support recovery in this matter.

### (iv) Extended General Conditions

McShane argues the district court erred in not awarding it the amount alleged for the extended general conditions due to Mallory's failure to complete their work in a timely manner, which it claims totaled $160,207.00. Brian Wood, McShane's project manager for the Project, testified that he arrived at the total alleged damages for extended general conditions by taking the sum of the original general conditions between McShane and the owner of the Project, divided the sum by the number of days the Project was originally scheduled to take to complete, and multiplied the daily general conditions figure by the number of days the Project was delayed. Wood testified that the daily cost of the general conditions for the Project was $2,200.00. Wood then testified that the Project was delayed 71 days from when the Project was supposed to be completed. Wood testified that the contract between McShane and the owner called for the Project to be complete by May 17, 2013, and was actually turned over on July 26, 2013.

The district court found that the calculation of these alleged damages were too speculative to be reasonably certain. The court first noted that the original contract between the owner and McShane was never introduced into evidence. The court then noted that most of the costs associated with the extended general conditions, such as the need for rental equipment, would have been less near the close of the Project. The district court also noted that McShane could have provided bills actually paid during the delay, but failed to do so. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with the extended general conditions.

### (v) Project Management Costs

McShane argues the district court erred in not awarding it the amount alleged for the project management time due to Mallory's failure to complete their work in a timely and correct manner, which it claims totaled $49,250.00. McShane argues that their project managers, Brian Wood, Ken DeBardelaben, and Scott Hoppa, devoted extra time to the Project due to Mallory's inability to properly install the sprinkler systems. McShane insists that the managers' work on the Project prohibited them from working on other projects, amounting to the damages alleged. The district court found that since these employees were salaried employees, the employees would have been paid the same regardless of which project they devoted their attention.

McShane also argues that the managers' travel expenses to the Project should be awarded as damages. The district court found that no evidence was adduced to prove these expenses were associated with Mallory's conduct on the Project and no evidence was adduced to prove these expenses were reasonable. Upon our review, we note that McShane produced no evidence that other clients failed to pay McShane due to the extra time the project managers devoted to the Project, nor were any specific billings for travel expenses introduced. Therefore, we find the district court was not clearly wrong in its denial of damages associated with the project managers' time and expenses associated with delays on the Project.

### (vi) Continental Sprinkler

McShane argues the district court erred in not awarding it the amount alleged for the cost of Continental to design, review, and complete the installation of the sprinkler system on Buildings 4-6, which McShane alleged totaled $7,925.00. Additionally, McShane argues that the district court erred in not awarding it the amount alleged for Continental's "emergency mobilization" in March 2013 after Mallory left the jobsite for the first time, which McShane alleged totaled $34,455.00. Finally, McShane argues that the district court erred in not awarding it the amount alleged for Continental to complete the installation of the sprinkler system in Building 7 after Mallory left the Project in May 2013, which McShane alleged totaled $38,800.00. The district court found that without evidence of invoices, the amount of damages requested for the review of Buildings 4-6 and the "emergency mobilization" was not reasonably certain. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with Continental's design and installation work performed on Buildings 4-6.

Regarding Building 7, McShane alleged that they paid Continental $38,000.00 to complete the building after Mallory left the jobsite. The district court found that this amount paid to

Continental was less than the $51,089.46 which was still due to Mallory under the Agreement for Building 7. The district court determined that because the amount paid to Continental was less than McShane would have paid to Mallory, McShane was not able to recover any damages on this claim. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with Continental's work performed on Building 7.

### (vii) Profit and Overhead

McShane argues the district court erred in not awarding it the amount it alleged was lost in overhead and profit, $22,466.64. Wood testified that he calculated this by taking the original overhead and profit from the contract between McShane and the owner of the Project and applying it to the cost of the substandard performance of Mallory. The district court found that there was no evidence of the contract between the owner and McShane. Therefore, no credible evidence was adduced as to the percentage utilized for profit. Thus, the damages were not reasonably certain. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with alleged lost overhead and profits.

### (viii) Electrical Expenses

McShane argues the district court erred in not awarding it $11,828.07 for the electrical utility expenses incurred due to the delay of 71 days for Mallory's remediation and completion of the sprinkler system. The district court found that the invoices admitted into evidence from the Omaha Public Power District pertained to multiple properties that McShane worked on, and that the invoices did not identify which buildings the cost of electricity was associated with at the time. The district court found that these alleged damages were not reasonably certain. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with alleged electrical utility costs.

### (ix) Additional Fire Wall and Doors

McShane argues the district court erred in not awarding it $657.20 in damages for the addition of a wall and fire door necessitated by Mallory's remediation work. The district court found that McShane did not produce any evidence of invoices for the installation of the fire wall and door nor was any evidence produced as to who installed them. Consequently, the court found the evidence to lack sufficient certainty to be a basis for damages. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with the installation of the wall and fire door on at the Project.

### (x) Lien Bonds

McShane argues the district court erred in not awarding it the amount alleged for paying off construction liens filed against the Project. McShane argues it paid $3,537.00 for a bond against the lien filed by Mallory and $8,571.63 to pay Howell's Fab. to remove their construction lien for supplies furnished to Mallory. The district court found that McShane did not produce any evidence of invoices for the alleged damages for the lien filed by Mallory. The district court additionally found that McShane failed to prove the original amount of the cost associated with the amount of materials purchased by Mallory or how much McShane paid to remove Howell's Fab. to remove

the lien. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with payment of the construction liens.

*(xi) Sprinkler Repairs*

McShane argues the district court erred in not awarding it $2,024.00 for repairs to the sprinkler system performed by Viking Sprinkler after the sprinkler systems were installed. The district court found that McShane did not produce any evidence of invoices for these alleged damages. Additionally, the district court found that the testimony regarding the work done by Viking related to RPZ valve replacement. The court determined that there was not sufficient evidence to demonstrate that the RPZ valves had been left in place by Mallory. There was evidence that the only RPZ valves remaining on the property when Mallory left were associated with a lawn irrigation system. Upon our review, we find the district court was not clearly wrong in its denial of damages associated with sprinkler systems repairs.

*(xii) Ferguson Supply*

McShane argues the district court erred in not awarding it the amount alleged for damages it incurred by paying Ferguson Supply for assignment of its claim against Mallory to McShane. The district court found that since it had already denied a motion to consolidate the Ferguson Supply claim with the present case before trial, the district court did not have jurisdiction over the claim. Upon our review, we find the district court was not clearly wrong in its choosing not to address any damages associated with Ferguson Supply.

(c) Dismissal of Negligence Claims

McShane argues the district court erred in dismissing its professional and ordinary negligence claims because Mallory owed McShane an independent duty under tort law and breached that duty. The district court determined that these claims were essentially alternative theories of recovery as to the breach of contract claim.

Where only economic loss is suffered and the alleged breach is of only a contractual duty, then the action should be in contract rather than in tort. *Lesiak v. Central Valley Ag Co-op*, 283 Neb. 103, 808 N.W.2d 67 (2012). The economic loss doctrine would not bar tort theories in cases, where either (1) the damages alleged were not solely economic losses or (2) there existed an independent tort duty alleged to be breached, which was separate and distinct from the contractual duty. *Id.*

Assuming, without deciding, that an independent tort duty existed which was separate and distinct from the contractual duties existing in this case, the district court's dismissal of the negligence claims would have been harmless error. The alleged tort duties in this case are closely related to the contractual duties. Many of the alleged damages in tort were remedied by Mallory's reentry into the Project, and its installation of the revised sprinkler plan. The remaining damages, whether couched in contract or tort, were identical. The court addressed these damages individually as to whether they were adequately proven. Some were awarded and some were not. The inadequacies of proof noted by the court on the damage claims rejected would not have been

- 15 -

cured by a tort theory of recovery. Therefore, we find that even if the district court's dismissal of the negligence claims was error, it would be harmless.

## VI. CONCLUSION

Upon our review, we find the district court did not err in its construction and application of the contract. The district court did not err by finding that McShane failed to prove its damages with reasonable certainty and by the greater weight of the evidence. The district court did err by finding the contract was divisible, but reached the correct result by awarding Mallory damages for the benefits conferred to McShane. The district court did not err by dismissing McShane's negligence claims against Mallory. The district court did not err by excluding certain evidence. The district court did not err by failing to award damages under the change order. Finally, the district court did not err by refusing to award prejudgment interest.

AFFIRMED.